(No. 54437.—

SIERRA CLUB *et al.,* Appellees, v. DAVID KENNEY *et al.,* Appellants.

*Opinion filed December 18, 1981.*

112

114

Tyrone C. Fahner, Attorney General, of Springfield (Clifford L. Weaver, of Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, Special Assistant Attorney General, of counsel), for appellants.

David Lincoln Ader, of Chicago, for appellees.

JUSTICE SIMON delivered the opinion of the court:

The local chapter of the Sierra Club brought suit in the circuit court of Jersey County to enjoin the Illinois Department of Conservation from logging or inviting bids for logging a portion of Pere Marquette State Park. The circuit court refused to issue the injunction but held up the Department's proposal for logging pending a review of the plans of the successful bidder. A divided appellate court reversed, holding that there was no statutory authority for the proposal; it enjoined the cutting of trees in State parks. (90 Ill. App. 3d 230.) This court granted leave to appeal

under Rule 315 (73 Ill. 2d R. 315). The appellate court's analysis was correct, but the result it reached must be modified.

Pere Marquette State Park was established in 1932 near the confluence of the Illinois and Mississippi rivers. At the time the action was started, the park's 7,743 acres made it the largest State park in Illinois. The area the Department proposed logging is in the Camden Hollow section of the park. The main recreational feature of that area is hiking and equestrian trails.

Camden Hollow, like much of the park, has been subject to many wildfires in the past. In 1974, an accidental man-made fire partially burned 345 acres of Camden Hollow. The terrain is rugged, and the fire damage was heavier higher up on the ridges. No immediate steps were taken in the burn area, and the natural process of regeneration began. The burn area, like much of the park, consists of oak and hickory trees, with a scattering of other species like maple, ash and elm. By the time the suit was heard, a rich new growth of young trees and other vegetation had joined the trees that survived the fire to fill the burn area.

In 1978, following a change in Department of Conservation policy, the Division of Forestry proposed that, for the first time in any Illinois State park, a commercial timber harvest and sale be carried out in the burn area. The Master Management Plan that was developed for Pere Marquette State Park at the same time labels the burn area as part of the Natural Resource Zone of the park. The plan calls for developing that zone by rehabilitating areas damaged by fire (with emphasis on the 1974 burn area), by grazing and by intensive logging.

The logging proposal had four listed purposes: salvage (of dead or injured trees to permit the use of wood fiber in the form of lumber or firewood that might otherwise go to waste), sanitation (to remove fire-damaged trees that are more susceptible to insects or disease), rehabilitation (to create conditions favorable for the growth and regeneration

of the oak-hickory climax forest) and wildlife habitat/ improvement (to create small openings and cover for game and to increase the eventual output from the remaining trees).

The proposal noted that delay in cutting would result in a substantial loss of wood fiber and the inherent revenue. It postulated that giving the remaining trees more light would increase their growth rate, that increased growth could be obtained through selective harvesting, and that this was desirable for healthy forest development.

The proposed logging was to be carried out by a commercial operator, who would bid for the right to remove trees marked in advance by the Department. In a marking guide drawn up to facilitate the selection of trees to be cut down, the listed objectives of the Department were salvage, sanitation and rehabilitation. The marking guide stated that wood-fiber production was not a management objective on the site. Trees that were injured by fire, insects or disease, or were susceptible to such injury, were to be marked for logging, provided they were merchantable. But, unsalvageable trees were to be left standing because of the potential value to wildlife. The Department proposal foresaw further cutting of timber that had no commercial value by an organization like the Youth Conservation Corps.

Initially marked for cutting were 1,973 trees, or 1% of the trees in the burn area. Of these, 18% were dead; another 60% were live trees to be removed because of damage from the 1974 fire. The remaining 22% were to be logged because they were "economically mature," although three-fourths of these had also suffered slight damage in the fire.

Three hundred forty-eight dead trees were marked for logging in the burn area; 862 dead trees were left unmarked because they were unmerchantable. Of the 1,625 live trees marked, only 1.7% would die each year. If not logged under the Department's plan, though, only 7.1% of those living

trees could be salvaged after they died. Ninety additional dead standard trees were later marked for cutting as well.

On August 28, 1978, the Division of Forestry announced a timber sale of the 2,063 trees. The sale was by sealed bid only; specifications for the maintenance of logging and park roads, for firebreaks and for erosion control were mandated. The bids were scheduled to be accepted on October 18, 1978, but the Sierra Club brought this suit before the bid date.

A hearing was held in which photographs of the area were presented by both sides. The trial judge also personally toured the area to be logged. At the hearing, David Kenney, the Director of the Department of Conservation, testified that the purpose of the operation was salvage, sanitation, the safety of those using the park, and the improvement of the park by hastening the regenerative process. The logging was to be handled by commercial sale because the Department did not have the manpower to do the job itself. The successful bidder would pay the Department for the right to log the park and then could sell the wood to recover costs. Kenney was unaware of plans to log any other State parks.

Allen S. Mickleson, the State Forester, and as such in charge of the Division of Forestry, testified that the proposed logging would speed up the natural processes of rehabilitating the burn area. Like Director Kenney he identified the purposes of the logging as salvage, sanitation, rehabilitation, and safety. In his opinion as a forester, the Department's plan was conservative forestry.

Mickleson said that 30 acres of the burn area were excluded from the sale because of the steep terrain or the lack of serious fire damage. The burn area, in his opinion, had been devastated.

Protection for the delicate ecosystem of the burn area was built into the contract for the logging. Water bars were required on skid trails, skidding of logs could only be uphill,

and rubbertired, not tracked, vehicles were required. Mickleson admitted that some of the smaller growth in the area would have to be taken out to accommodate equipment and to build staging yards to store the logs before they were driven out of the park. He did not anticipate excessive compacting of the soil or the widening of any roads for the logging machinery.

Mickleson had been State Forester under a prior administration and had been witness to several policy shifts within the Department of Conservation. He characterized the decision to log as a change from emphasis on preservation or recreation with little emphasis on conservation to one of total balance, dedicated to multiple use of the State parks. Multiple use, he said, could be a combination of productive and "nature conservation concerns." The Department believed in conserving natural resources; Mickleson noted that because of the energy shortage there was a commercial demand for the logs being removed.

The Sierra Club presented testimony of two witnesses who had observed the area to be logged. One, a veteran hiker, said that the effects of the fire varied throughout the area, with some trees completely dead, others showing some foliage along with scars from the fire, and still others showing complete foliage despite minor fire damage. After a similar fire in Georgia whose effects he had observed, the area was not logged, but left to natural regeneration.

Edmund Woodbury, chairman of the Sierra Club's Great Lakes Chapter, testified that a lay person would not notice that there had been a fire in the burn area. Once he learned that there had been a fire, however, its effects became clear. It seemed to him that most of the trees marked for cutting had a full canopy of leaves. He saw extensive new growth of vegetation and trees sprouting from stumps in the burn area. A site he had seen in Canada after a forest fire had been turned into a wasteland by the combined effect of a ravaging fire and man's cleanup.

Two forestry experts testified. For the Sierra Club, Dr. James S. Fralish, an associate professor of forest ecology at Southern Illinois University, told of the results of controlled experiments with forest fires he had carried out in Shawnee National Forest in southern Illinois. Different types of trees display differing resistance to fire; pines and oaks are especially resistant.

Dr. Fralish, who had toured the burn area, characterized it as in a state of recovery. Many trees killed by the fire were sprouting back from the base. He saw oak saplings six to eight feet high already. Although most of the trees marked for cutting had some kind of minor fire damage, Dr. Fralish said that it was common for trees similarly scarred to continue to grow for 60 to 70 years after a fire. About 10% of the trees were barren.

Dr. Fralish would not call the burn area devastated. While some areas were poorly stocked with trees, others were adequate; the area marked for logging was not overstocked or surplus. Dr. Fralish saw no evidence of insect infestation in the area marked for logging or of a threat to low-vigor trees there. He could find no reason to rehabilitate the area; the habitat was all there and did not have to be reconstructed. Cutting the low-vigor trees in the burn area to favor the high-vigor trees would change the character of the stand, because the low- and high-vigor trees are scattered together throughout the park.

Dr. Fralish listed the dangers of the proposed logging. Mechanized equipment could squash the young regrowth. Skidding logs could tear up the litter layer on the forest floor and disturb the process of decay that provides nutrients. Heavy equipment could cause soil erosion. As a general rule, he said, the more the cutting, the more the damage to the ecosystem.

For the Department, Dr. George Thompson, chairman of the department of forestry at Iowa State University, testified that overall the burn area was of average quality,

with some good and some poor portions. Dr. Thompson considered the proposed logging to be a conservative plan in keeping with good forestry practices. But he had never heard of a commercial logging operation to remove live, dead and damaged trees after a fire like this in Iowa.

The trial judge found that the 345-acre burn area had not been devastated, and that the tract had shown the ability to regenerate itself through natural processes, but that the Department's plan to log could not be said to be against good forestry management. However, the circuit court judge found that the logging of trees as proposed posed great dangers to the environmental well-being of the area in question. He cited increased dangers of fire, erosion and injury to young trees not designated for cutting. He expressed the fear that a poorly handled logging operation would cause permanent and widespread injury to the area, and that the operation would deny access by the public to the area for two years.

Although he refused to enjoin the logging proposal, the trial judge required that the Department furnish proof that the contractor chosen was a reliable and responsible operator and that there would be no permanent injury because of the logging.

The Department's proposal to log the Camden Hollow section of Pere Marquette State Park was apparently a good-faith attempt to exercise its discretion in the management of the park consistent with advanced and scientific forestry practices. However, Pere Marquette is a State park, not a State forest, and the techniques developed to encourage productivity and growth in State forests or privately owned timberlands are inappropriate in State parks. The production of commercially valuable timber and forests is subordinated in parks to preservation and recreation. The decision is not left to the discretion of the Department; the policy has been mandated by statute. To the extent that the decision to log reflected a policy change in the Department,

it was a change in policy the legislature had not authorized the Department to make.

The Department of Conservation's responsibility is to manage all State parks, including Pere Marquette, in keeping with the policies established by the legislature. (Ill. Rev. Stat. 1977, ch. 105, par. 465.) The Department is to fulfill this task, as it fulfills its other statutory tasks, through the use of the statutory powers granted it (Ill. Rev. Stat. 1977, ch. 127, par. 63a1 *et seq.*). The Department is directed to keep the State parks "open to and *** for the benefit and enjoyment of all the people" of the State. Ill. Rev. Stat. 1977, ch. 105, par. 465.

In addition to State parks, the legislature has established State forests (Ill. Rev. Stat. 1977, ch. 96½, par. 5901) and State nature preserves (Ill. Rev. Stat. 1977, ch. 105, par. 466a). Each was similarly placed under the Department's control. Different interests are at stake in the management of each type of resource. The options are to develop the land for the commercial value of its timber, to use the land for recreation, or to preserve the land in its natural splendor for its aesthetic and cultural value. These uses are not necessarily conflicting, but are not perfectly reconcilable. The statutes governing the management of State forests, State parks and nature preserves reflect a legislative balancing of interests to allow a mix of different uses at each type of resource.

In State forests, the legislature has chosen to give priority to the production of continuous crops of timber for the use of the people and industries of the State. (Ill. Rev. Stat. 1977, ch. 96½, par. 5905.) The Department is authorized to sell the timber, but is restricted to cutting and removing forest products in keeping with the best forestry practices. (Ill. Rev. Stat. 1977, ch. 96½, par. 5906.) Commercial timber forests are also suitable for recreation and provide scenic beauty; thus, as a second priority the legislature has decreed that the Department must also make State forests accessible

to the general public for recreation by providing improved highways through the forests. (Ill. Rev. Stat. 1977, ch. 96½, par. 5906.) Residual uses are contemplated by the legislature as well—State forests protect watersheds and maintain the purity of streams and springs. Ill. Rev. Stat. 1977, ch. 96½, par. 5902.

At the other end of the spectrum, nature preserves are established by the legislature to preserve and protect areas "against modification resulting from occupation or development which would destroy their natural condition." These lands have been set aside for research, teaching, natural and historic interest, and as "living illustrations of our original heritage wherein one may experience or envision primeval conditions in a wilderness type environment." (Ill. Rev. Stat. 1977, ch. 105, par. 466a.) In maintaining nature preserves, the legislature has commended the Department to conserve the "original character as distinguished from the artificial landscaping" of the land. (Ill. Rev. Stat. 1977, ch. 105, par. 467.) In a nature preserve, then, the interest in the preservation of aesthetic and cultural values takes first priority, to the exclusion, if necessary, of conflicting commercial or recreational uses.

State parks strike a third balance; but while they are different from state forests they bear many similarities to nature preserves. They place the major emphasis on recreation but are also dedicated to preservation. State parks are established to preserve large forested areas and marginal lands near waters for recreation. But the types of recreation to be offered are limited. The legislature mandates that a State park offer recreation opportunities "different from that given by the typical city park." (Ill. Rev. Stat. 1977, ch. 105, par. 466(3).) But recreation is not the sole priority; the parks are also preserved by legislative directive for their aesthetic and cultural value so that they "may remain unchanged by civilization, so far as possible, and be kept

for future generations." Ill. Rev. Stat. 1977, ch. 105, par. 466(3).

In addition, State parks are established to preserve the most important historical sites, to set aside areas of scenic and scientific interest, and to connect parks through a system of scenic parkways. (Ill. Rev. Stat. 1977, ch. 105, pars. 466(1), (2), (4).) Notably lacking from the purposes of a State park is any mention of improving or selling the timber grown in them.

To serve the prime recreational purpose of the State park the legislature allows some improvements, but these alterations of the park's original character are limited to those which aid recreation—roads, bridges, trails, camping sites, picnic areas, and the like. (Ill. Rev. Stat. 1977, ch. 105, par. 468(3).) If natural plant areas in a park are devastated, the Department is authorized to replant, increase or supplement those areas. (Ill. Rev. Stat. 1977, ch. 105, par. 468(4).) But the statutory authority for improving the parks is narrow—in maintaining a State park the Department is barred from artificial landscaping. As in a nature preserve, the mandate of the legislature is to conserve the original character of the park. Ill. Rev. Stat. 1977, ch. 105, par. 467.

In summary, the scheme adopted by the legislature reserves State forests for commercial development and recreation, State parks for recreation and preservation, and nature preserves for preservation and recreation. In State forests there is little place for preservation of the forest in its natural state—improvement of the stand is the order of the legislature. In State parks and nature preserves there is little place for improvement of the forest for commercial development —preservation, for recreation or aesthetic or cultural values, and recreation are what the legislature has ordered.

When the question is the management of forested lands, the distinction between State parks and nature preserves, on

the one hand, and State forests, on the other, crystallizes in the criminal penalty provisions of the statutes controlling each. It is a misdemeanor to remove individual *trees* or *timber* in a State park or nature preserve. (Ill. Rev. Stat. 1977, ch. 105, par. 468(b)(1).) By contrast, only removing *trees* is a misdemeanor in a State forest. (Ill. Rev. Stat. 1977, ch. 96½, par. 5911(2).) The difference in wording can be readily explained by the differing legislative intent on the use to which parks, preserves and forest are to be put. State forests exist to grow trees for timber, and thus it is illegal to remove trees before their time but not illegal to harvest them as timber. State parks and preserves are not meant to provide commercial timber, and thus it is illegal to remove both trees and timber from them.

This interpretation of the statutes unifies both the general grants of power to the Department and the specific instructions given to the Department on how to manage the areas under its control. It does not defer to the interpretation adopted by the Department, the administrative agency delegated to carry out the statutes, because the Department does not have a long experience with its interpretation or the policy it now proposes to pursue which has lent credence to it. (See *American Oil Co. v. Mahin* (1971), 49 Ill. 2d 199, 205.) This is, in fact, the first time the Department's interpretation has been put to the test.

The objectives stated by the Department's witnesses bear little relationship to the recreational, aesthetic or cultural uses of a State park. Salvaging timber before it rots *is equivalent to the production of a crop of timber.* Sanitation of a forest can protect it from disease or infestation that would threaten the proper uses of a State park, but no evidence here indicates any unusual threat of insect infestation or disease. Likewise, the safety of those in a park can be imperiled by dead or injured trees, especially near trails or campsites, but there is no evidence of such threats from the trees marked for logging. The evidence shows no need to

rehabilitate the burn area; all that is required for the forest to regain its original vigor is time. By selective harvesting of trees in the burn area the productivity of the forest can be more than doubled, but stimulating forest growth in this manner is the work of civilization from which the legislature tells us the State parks are to be, so far as possible, immune.

The goals of the Department in embarking in good faith on a logging program in a burn area may be laudable, and a sound exercise of discretion, when applied to a State or privately owned forest. But careful and prudent exercises of discretion are to no avail if the result is beyond the goals mandated by the statutes granting the Department the authority to manage State lands. (*Village of Lombard v. Pollution Control Board* (1977), 66 Ill. 2d 503 (Board without the power to require regional sewage facilities because not authorized to take such action by statute).) The Department's discretion is harnessed within the policies adopted by the legislature. In a State forest, it is to manage the trees to produce the most and best timber available. In a State park, it is to leave the trees be.

The plan to log in Pere Marquette State Park is not authorized by statute. In addition, it runs afoul of several statutory provisions. Fires and their effects are part of the original character of Pere Marquette State Park. The source of a fire (natural or man-made) does not change its natural effect. However characterized, the Department's program constitutes artificial landscaping. The legislature has chosen not to permit this. Ill. Rev. Stat. 1977, ch. 105, par. 467.

The effort to attenuate the effects of the fire by logging to speed regrowth does not leave the park unchanged by civilization, as the legislature intended. (Ill. Rev. Stat. 1977, ch. 105, par. 466(3).) Even though the plan may be conservative forestry, there is no showing that *any* of the techniques of civilization are necessary to serve the recreational purpose of the park. It should be noted that by leaving the

burn area alone, the Department would serve one park purpose—providing an area of scientific interest, a living laboratory in which the process of regeneration could be studied. In addition, the loss of two years of public access to the burn area of the park violates the legislative decree that State parks be kept open for the benefit of all the people. Ill. Rev. Stat. 1977, ch. 105, par. 465.

It is unnecessary to consider the place in this statutory scheme of the Department's authority to replant devastated park areas. Even if this authority embraced the clearing of deadwood prior to planting, the section does not apply in this case, because the trial judge found that the area was not devastated, a statutory prerequisite to the Department's authority to replant (Ill. Rev. Stat. 1977, ch. 105, par. 468(4)).

The Department claims three statutes give it the authority to log in the park. All three fall within the Civil Administrative Code of Illinois rather than the specific statutes establishing State parks. The first is the power granted to the Department of Conservation to promote forestry, including measures for reforestation, woodland management and forest marketing and utilization. (Ill. Rev. Stat. 1977, ch. 127, par. 63a8.) This statute's all-encompassing provisions, consistent with the Department's duties with the purposes of State forests but inconsistent with the purposes of State parks, cannot control the more specific State-park statute. A policy expressed in a specific statutory reference should prevail over general statutory statements. *Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 533-34.

Second, the Department points to its authority to sell "surplus agricultural products grown on land owned by the Department, when such products cannot be used by the Department." (Ill. Rev. Stat. 1977, ch. 127, par. 63a26.) Is timber an agricultural product? In *People ex rel. Pletcher v. City of Joliet* (1926), 321 Ill. 385, the court examined a

statute which turned on whether land was used for agricultural purposes. A dictionary definition was cited which said that, in its broadest sense, agriculture included forestry. But the statement was mere *dicta;* the land in question grew grapes and hay. The same statute was declared unconstitutional in *Forsythe v. Village of Cooksville* (1934), 356 Ill. 289. While analyzing the statute, the court said, again in *dicta,* that timberlands would not be covered by the statute. It is unnecessary to resolve the issue here. Even if timbered lands were agricultural, the Department has not fulfilled the other requirements necessary to harvest surplus agricultural products.

The statute the Department points to requires that the agricultural product to be sold be surplus. The record does not indicate that the trees in the burn area are. The only direct evidence on the point was that the land was not overstocked and that there was no surplus. The Department's own evidence suggested a proper use for even the dead trees—as a wildlife habitat. The statute also requires that the agricultural products be grown by the Department. The Department has not grown these trees. What it proposes is a harvest of wild trees. Finally, the statute requires that the Department be unable to use the products to be sold. There is no showing that the 2,063 trees here cannot be used by the Department, either in their present state as stark reminders of the effects of fire in woodland habitats or as firewood to be used in the Department's campgrounds.

Third, the Department points to its authority to sell "gravel, sand, earth or other material" from State-owned land as empowering it to carry out a commercial timber harvest. Under the doctrine of *ejusdem generis,* the term "other materials" can only be interpreted to include materials of the same general type. (*Farley v. Marion Power Shovel Co.* (1975), 60 Ill. 2d 432, 436.) Timber, like sand, gravel and earth fill, is part of the bounty of the earth's surface. But it would both defy common sense and render

the other statutes on timber sales surplusage to include timber in this section. We decline to do so.

Pere Marquette State Park in its present state is an irreplaceable natural resource. It is held in trust by the State, a holding designed by the legislature to serve the enjoyment and benefit of all the people of the State as a whole. Its future should not be charted by the Department's strained interpretation of guidelines the legislature has given to the agency entrusted with the management of this resource. Where the authority for the Department's irrevocable plan is at best ambiguous, and at worst nonexistent, it is prudent to adopt a "fail-safe" interpretation of the statutes governing the Department and the parks. If the legislature, when presented with the problem, should approve the logging proposal, the trees will still be there to cut. If this court allowed the logging despite our view that the legislature had not intended such a result, it would take decades for the area to regain its original character as a forest untouched by the improvements of man.

Accordingly, we find the logging proposal inconsistent with the legislative purpose for a State park. The Department should therefore be enjoined from proceeding with its logging proposal without more concise legislative directives. The circuit court was incorrect in finding statutory authorization for the logging proposal. The appellate court correctly reversed that portion of the circuit court's judgment.

The appellate court, however, went too far. In ordering the circuit court to enter an injunction as sought in the complaint, the court mandated the Department to "keep from cutting down, harvesting, and logging trees in state parks and conservation areas or from inviting and/or accepting bids, and/or making or entering into contracts or other arrangements, or from in any way authorizing any person to cut down, harvest, and log trees located in or on state parks or conservation areas." This injunction is too broad. While

the proposed logging does not comply with the statutes, another selective removal of trees might. An area might have to be opened up for a hiking trail, picnic area or campground, and in such a case the recreational use of the park would take priority over the desire for preservation. It is only when the logging does not serve the recreational or preservation purposes of the park that it must be enjoined.

Instead of the broad injunction entered by the appellate court, the circuit court's injunction should be limited to the Department's proposed timber sale in Pere Marquette State Park. The Department should be left free to carry on its statutory duties in the future in keeping with the views expressed in this opinion and the careful exercise of the Department's discretion.

Accordingly, the judgments of the appellate and circuit courts are vacated and the cause is remanded to the circuit court for entry of an injunction that is in accordance with the views expressed herein.

*Vacated and remanded,*
*with directions.*