THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID DENSON, Defendant-Appellant.

Second District   No. 84—0728

Opinion filed December 31, 1985.

G. Joseph Weller and Marshall J. Hartman, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

Defendant, David Denson, was convicted at a jury trial of the murders of Angela Gardner and George Coleman. The trial court initially sentenced defendant to two concurrent 40-year terms of imprisonment. On the petition of the State, however, our supreme court subsequently entered an order in the exercise of its supervisory jurisdiction requiring the trial court to impose a sentence of natural life imprisonment pursuant to section 5—8—1(a)(1)(c) of the Unified Code of Corrections. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c).) The trial court imposed that sentence, and defendant appeals, contending (1) that the convictions of murder should be reduced to voluntary manslaughter because he believed, albeit unreasonably, that the killings were justified; (2) that the jury should not have been instructed regarding the use of force in self-defense by one who is the initial aggressor; (3) that the order of our supreme court requiring the trial court to impose a sentence of natural life imprisonment violated supreme court rules and defendant's constitutional right against double jeopardy; and (4) that section 5—8—1(a)(1)(c), which requires a sentence of natural life imprisonment where a defendant is convicted of murdering more than one victim, is unconstitutional under the eighth amendment prohibition of cruel and unusual punishments. U.S. Const., amend. VIII.

The evidence at trial showed that defendant shot Angela Gardner and George Coleman at about 8 p.m. on November 1, 1983, at the corner of Ninth and Lenox streets in Waukegan. Both victims died from the gunshot wounds. The State presented the testimony of three occurrence witnesses: Bernard Jedkins, Samuel Jenkins, and Ronald Allen. It also called several police officers to whom defendant had made statements about the incident.

Jedkins was 17 years old at the time of trial. He had been adjudicated delinquent for committing a theft and was on probation. He testified that on November 1, 1983, he was in front of George Coleman's house with George, Angela Gardner, Ronald Allen, Sam Jenkins, and Sam's girl friend, Angie Moore. Defendant drove up in a blue Ford, and Sam went up to his car and talked with him. When Sam returned, Jedkins and he walked Sam's girl friend home. Angela Gardner, Ronald Allen, and George Coleman went into Coleman's house.

After Jedkins and Sam had walked Moore home, they went to defendant's house. They arrived there at about 7:30 p.m. and stayed for about a half hour. Jedkins testified that while they were at defendant's house, he told defendant that he had heard "some boys were supposed to be messing with" defendant. Defendant replied that he

already knew that. Defendant said that he and Angela Gardner had broken up, and that they had an argument or a fight. According to Jedkins, he, defendant, and Jenkins "talked about that she [Angela Gardner] had gotten the boys to beat him up, something like that." Defendant said that he was going to whip her for doing that, and because she had falsely accused him of raping her. While they were at defendant's house, Ricky Allen came over and asked for Jenkins. Jenkins left with Allen. When Jenkins returned, he told Jedkins that he had gone to the store to buy Ricky some cigarettes.

Jedkins testified that when he, defendant, and Jenkins left defendant's house, they walked to Jim Griffin's house. On the way there defendant told the others that he was going to shoot Angela Gardner in the head, and that he was going to shoot the person that was with her. From Griffin's house they then walked back to defendant's car, defendant telling the others that Jim Griffin was moving to another residence that night, and that he was going to help. Defendant and the others got into his car. Defendant was in the driver's seat, Jenkins sat in the front passenger seat, and Jedkins was in the back. At this point George Coleman approached the car and asked Sam a question. Jedkins did not know what Coleman asked him.

Jedkins testified that defendant subsequently started the car and began to drive down the street. They saw Angela Gardner and George Coleman come out of Ronald Allen's house. Defendant said, "I'm going to beat this bitch's ass," and he started to turn into Allen's driveway. Jenkins grabbed the steering wheel and directed the car forward past the driveway. Jenkins told defendant, "Don't do it, man."

Defendant then drove a couple of blocks away. During the drive he asked Jedkins and Jenkins if they were going to help fight the guy that was going to jump him. They replied that they would have nothing to do with it. Defendant stated he was going to kick Angela's ass. When defendant stopped the car, Jenkins "told him no." Jedkins then said, "Go ahead, let him do what he wants to. Just stay up here and we won't have nothing to do with it."

Defendant exited the car and started jogging down Lenox Street toward the intersection with Ninth. Jedkins and Jenkins jogged after him. Jenkins grabbed defendant and told him, "Don't do it." Defendant pushed away from him and said, "Fuck you." Jedkins then grabbed defendant by the arm and said, "Just forget it," but defendant pulled away from him too. Jedkins testified that he saw Angela Gardner and George Coleman near the intersection. No one else was with them. When defendant was about 10 or 15 feet away from them,

he pulled out a gun. Defendant ran closer to them and then shot Angela Gardner. Angela screamed, "Oh, my God, David," and fell to the ground. George Coleman ran away, and defendant chased him. Jedkins then heard two more shots. According to Jedkins, neither Gardner nor Coleman had been carrying weapons in their hands.

The day after the shooting the police had found a broken pocket knife with a hook blade near the scene of the shooting. Jedkins testified that the knife was his, and that he had lent it to Jenkins a day or two before the incident. Jedkins did not see Jenkins pull the knife out at the time of the shooting incident. Jenkins threw it down the street after the police arrived at the scene.

On cross-examination Jedkins stated that he gave a statement to a police officer the night of the shooting. He did not tell the officer that defendant had said he was going to shoot Angela. Jedkins testified that he "just didn't want to bring that out then." The first time Jedkins told anybody that was in the middle of January 1984, when he told defendant's private investigator. Jedkins acknowledged that he did not tell the officer about his knife. The first time he told anyone about the knife was when the prosecutor asked him about it in late January 1984.

Samuel Jenkins was also 17 years old at the time of trial. He had been adjudicated delinquent for committing a burglary and was on probation. His testimony was substantially the same as that given by Jedkins. Jenkins said that when Ricky Allen came over to defendant's house prior to the shooting, he and Jenkins did not talk about defendant and Angela Gardner.

Ronald Allen was 14 years old at the time of trial. He had been adjudicated delinquent for committing an armed robbery, and he was on probation. He testified that at about 7 p.m. Angela Gardner, George Coleman, and he went to his house. They went down to the basement and watched television along with Ricky Allen. After about five minutes George Coleman left to do something for one of his friends. Later on Angela Gardner told Ronald and Ricky Allen that defendant had tried to rape her the week before. She asked Ricky to go to defendant's house to talk to him about this matter. Ricky left and returned about five minutes later. Sometime later George Coleman came by, knocked on the window, and told Ronald to tell Angela Gardner to come out. She and Ronald went outside and joined George Coleman. The three then began walking toward the intersection of Lenox and Ninth. Ronald testified that his mother called him back. When Ronald returned home, he heard gunshots.

Officer Miscichowski, a detective with the Waukegan police de-

partment, testified that at about 10 p.m. on the night of the shooting, defendant telephoned the police. station. Defendant stated that the shooting was no cold-blooded murder, and that he would like to give his side of the story. Miscichowski and two other officers went out to defendant's grandmother's house where defendant was and picked him up. On the way to the police station, defendant showed the officers where he had hidden the gun. When they arrived at the station, Miscichowski introduced defendant to Detective Pratt and told him that Pratt would take his statement.

Detective Pratt testified that after he advised defendant of his *Miranda* rights, defendant told him that at about 4:30 p.m. on the day in question he had helped somebody move. He arrived home around 7:30 p.m., where he met with Sam Jenkins. They went for a walk and then returned to defendant's home. They then went for a ride down to the Utica Project where they stayed for only a few minutes. They left Utica Project in defendant's car and drove down Lenox. Sam Jenkins wanted to see a girl at the corner of Eighth and Lenox. Defendant parked his car there. They exited the car and began walking toward the intersection of Ninth and Lenox. Defendant saw a group of subjects approaching him. Jenkins told him that these subjects were the ones that had been looking for him to beat him up. Jenkins and Jedkins, who was also with defendant at that point, turned around and said they did not want to get involved. Defendant continued to walk toward Ninth. He saw Angela Gardner, George Coleman, and Coleman's brother approaching him, and he saw a group of subjects behind them. As he approached them, someone from the group threw an object at him which struck him on the lip. Defendant told Pratt that Coleman stated, "What is this I hear about you and my woman?" Coleman said some other things defendant could not remember. Defendant pulled his gun out and shot Coleman. He then panicked and shot Gardner. Pratt asked defendant why he shot Coleman and Gardner, and defendant said that he did not know. He then said that he was afraid that they were going to beat him up as they had been telling people they were going to do. Pratt asked defendant if he felt that Gardner or Coleman had a gun, and defendant replied that he did not think so. Finally, Officer Pratt testified that when he interviewed defendant he saw a mark on defendant's lower lip. Pratt said, "Looked like somebody had busted his lip or something." After his interview with Detective Pratt, defendant was taken into custody.

Detective Ralph Henriquez testified that he interviewed defendant the following day at about 10:30 a.m. After he advised defendant of his *Miranda* rights, Henriquez asked him whether there had been a

group of people with Gardner and Coleman at the time of the incident. Defendant replied that as he approached them, Gardner and Coleman were alone, but that there was a group of people about a half a block behind them. Henriquez asked defendant why he pulled the gun out, and why he had been carrying it. Defendant said that he pulled the gun out because he was very angry at Angie and was not thinking right. He said he had been carrying it "in case anybody tried to hurt him, he would be ready." Finally Henriquez testified that he asked defendant where he had received the mark on his lip. Defendant replied that he was not sure whether he received it before or after the shooting incident, but that somebody had thrown something at, him.

The defense presented testimony from defendant himself, Ricky Allen, and Mark Rodriguez. Defendant testified that he had known Angela Gardner for about nine months before the shooting incident. In June of 1983 they began dating. They had sexual relations once at defendant's house. Defendant did not rape her; Angela was a willing participant.

The doctor who performed the autopsy on Angela Gardner had testified that she had two tattoos on her arm. One was the Playboy bunny logo, and the other was a picture of a hat and a cane with the letters "VL". Defendant testified that he asked Gardner about her tattoos, and she told him they stood for the gang she was in, the Vice Lords. The tattoo with the hat and cane signified that she "had a little rank" in the organization.

About two months before the shooting incident, defendant broke up with Gardner and began seeing Sharon Daniels. He had a baby by her. Gardner did not want to accept this change. People started telling defendant that Gardner was out to get him because he had raped her and taken $2 from her.

About four of five days before the shooting, defendant was driving his car when he saw Angela walking home from school. He stopped his car, got out and told her he wanted to talk to her. She pointed to the tattoos on her arm and said, "Now you going to get yours."

During the week or two prior to the shooting, defendant was walking down the street when three young men came out of a store and approached him. Defendant knew these individuals only by their "street names," Baby G, Scarey, and Kenny. They asked defendant, "Why you do Angela like that?" Defendant asked them what they were talking about. One of them replied, "Man, what you did to her, man. You shouldn't be playing with my lady like that. You can't be do-

ing that. Man, you going to end up getting it, man." Defendant tried to explain to him that Gardner was just angry because he had left her for another girl, but they started "talking crazy," and defendant left.

During the same two-week period defendant was at home when G, Scarey, and another young man came over. They were members of the Vice Lords gang. They asked him if he raped Gardner, and defendant replied that he had not. One of the men at the door said, "Well, that is what she told me, man." Defendant denied it again, and he replied, "Man well, I think you lie. Plus, on top of that she told us you took her money." He began talking about what he was going to do to defendant, and defendant shut the door. Then they banged on door. Defendant got his gun and opened the door. One of the men outside saw the gun and said, "Yeah, you will get yours, motherfucker. We catch you in the streets. Sooner or later you got to come out." The men then left his house.

Defendant testified that about two days before the shooting, as he was walking over to Jenkins' house, Ricky Allen, G, Peanut, and Dog surrounded him. Ricky Allen pulled out a knife and told defendant that he was going to "kick his butt" because he took Gardner's money. Defendant told him, "You know it ain't true." Ricky replied, "No, man. That is what she told me." Someone behind defendant said, "Well, she told me that you raped her, man." Defendant was then pushed, and he ran between two of them and escaped to Jenkins' house, where he stayed for a few hours.

On the date of the shooting defendant helped the Griffins move. Earlier in the day he saw Gardner standing in front of Coleman's house. Defendant approached her and told her he wanted to talk to her, but she ignored him and went into the house.

Later that day defendant went home, and Jedkins and Jenkins were in front of the house waiting for him. All three men went into the house, and defendant changed his clothes in his room. While he was changing, Ricky Allen knocked on the door and asked to speak with defendant. When defendant came out of his room, Sam and Ricky had left. Sam returned a short time later.

Defendant testified that Jedkins told him, "Angela got these folks out about, want to wup your butt about something, man." Jedkins said that she tried to get him and Jenkins to set defendant up. Defendant replied that he was going to find out what was going on, and that he was going to ask Gardner. Jedkins replied, "No, man, because it is a couple of them outside now, man, waiting on you." Defendant replied that he was going to find out what was happening notwithstanding.

They left defendant's house and went for a walk. When they got tired of walking, they returned to defendant's car. They got in, and as defendant started driving off, he saw Gardner and Coleman coming out of Allen's house. Defendant slowed down and said, "I want to find out what is happening now." Jenkins told him not to because there were more people in Allen's house. Defendant then said he ought to whip Gardner's ass, and Jenkins told him to forget it.

Defendant then pulled out and drove for a couple of blocks, and told Jenkins that, despite his protests, he (defendant) was going to find out why Gardner had "all these people after him." Defendant parked his car and told Jedkins and Jenkins to come with him, and he asked them if they would back him up in case he got in a fight. Jenkins said, "Man, I don't want to. Come on. Come on, Bernard. Let's go, man." Defendant told them to wait a minute, took his gun out of his tool box, and put it in his pants.

The three men then walked toward the intersection of Lenox and Ninth. They saw Gardner and Coleman. Defendant said that he was "going to find out," and Jenkins told him to forget it, and that he did not want to get involved. Defendant continued to walk toward the intersection, and he saw a group of people approaching, about three houses behind Gardner and Coleman. There were five, six, or seven young men. Scarey and Dog were among them. Defendant recognized some of the group as members of the Vice Lords gang or the Kingsmen gang. Coleman was also a gang member.

When defendant was a couple feet away from Gardner and Coleman he stopped. At that time he had his gun out for his own protection. Coleman said, "What is this between you and my woman?" As defendant was looking at Coleman, something struck him in the mouth and snapped his head back. Defendant was scared so he shot Coleman. Gardner then bent down, and defendant "just jumped and the gun went off again." Coleman ran down the street, and everybody else started running. Defendant then panicked and took off.

Ricky Allen testified that at the time of trial he was 21 years old. He had previously been convicted of misdemeanor theft, and he was awaiting trial on a charge of residential burglary. Allen stated that in the fall of 1983 defendant dated Gardner. He testified that on the night in question he was watching television in his basement when his brother Ronald Allen came down with Gardner and Coleman. Gardner asked Ricky if he could go over and talk to defendant because he had been "acting kind of funny." She said she and defendant had been arguing. Ricky then went over to defendant's house and told him that Gardner had sent him to find out what the problem was with defend-

ant. Defendant replied, "Man, the problem ain't with me. It is with her." Jenkins then came out of defendant's house, and he and Ricky Allen went to Allen's car, where they talked about an unrelated matter. Jenkins then went back to defendant's house, and Ricky returned to his basement. When he got there, he told Gardner what defendant had said. Gardner then asked him if he could get somebody to beat defendant up. Ricky replied that he would not, and that he had nothing to do with their problems. Ricky Allen never told defendant that Angela made this request.

Mark Rodriguez testified that at the time of trial he was on parole for burglary. He was in jail awaiting trial on a charge of unlawful use of weapons. Rodriguez said that within a couple of months prior to the shooting, he and a guy he was with had a conversation with Angela Gardner by Coon's Grocery. Gardner asked Rodriguez to kill defendant and said she would have sexual relations with Rodriguez and his friend in return. Rodriguez did not tell Gardner whether he would or he would not kill defendant. Rodriguez said he looked for defendant to tell him about the incident, but he could not find him. He did not tell defendant about it prior to the shooting.

In addition to the testimony outlined above, the defendant called several witnesses to testify concerning his good character.

In rebuttal the State presented, by way of stipulation, testimony of an assistant State's Attorney that prior to trial Ricky Allen told her that if she would drop the residential burglary charge against him, he would testify at defendant's trial any way she wanted him to.

It was based on the evidence recounted above that the jury found defendant guilty of murdering Gardner and Coleman. We now consider defendant's argument that the convictions of murder should be reduced to voluntary manslaughter because the evidence showed that he believed, albeit unreasonably, that the killings were justified. The offense of murder is defined in section 9—1 of the Criminal Code of 1961, in pertinent part, as follows:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another ***."

(Ill. Rev. Stat. 1983, ch. 38, par. 9—1.)

The offense of voluntary manslaughter is defined in section 9—2 of

the Criminal Code of 1961, in pertinent part, as follows:

> "(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (Ill. Rev. Stat. 1983, ch. 38, par. 9—2.)

Article 7 includes section 7—1, which provides in relevant part that a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another ***." (Ill. Rev. Stat. 1983, ch. 38, par. 7—1.) Thus, the distinction between murder and voluntary manslaughter is in the mental state of the offender. In the case of voluntary manslaughter the offender believes, albeit unreasonably, that his use of deadly force is necessary to prevent imminent death or great bodily harm, and in the case of murder the offender does not have such a belief. Where the defendant presents some evidence of that issue, the burden is on the State to prove beyond a reasonable doubt that he did not have such a belief in order to obtain a conviction of murder. *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380.

In this case, there is credible evidence in the record supporting the conclusion that defendant did not believe that the shooting was necessary to prevent imminent death or great bodily harm. Both Bernard Jedkins and Samuel Jenkins testified that defendant sought out Gardner after saying that he was going to shoot her and whoever was with her. They testified that defendant ran up to Gardner and Coleman and shot them although neither of the victims was armed. Defendant argues that the uncontradicted evidence of his "busted" lip supports his contention, but Officer Henriquez testified that defendant told him that he was not sure whether he received the injury before or after the shooting. Defendant also told Henriquez that he pulled his gun out because he was very angry at Gardner and was not thinking right, a statement which impeaches defendant's claimed belief that the killings were justified by self-defense. While defendant presented other evidence supporting his claim, it is up to the trier of fact to determine the credibility of the witnesses and the weight to be given to their testimony. (*People v. Ingram* (1983), 114 Ill. App. 3d 740, 449 N.E.2d 564.) The evidence was sufficient to support the jury's conclusion, and this court cannot properly reduce the degree of the offense to voluntary manslaughter. *People v. Ingram* (1983), 114 Ill. App. 3d 740, 449 N.E.2d 564.

The cases cited by defendant are distinguishable. In *People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409, the evidence was undisputed that in the course of a heated argument the victim lunged at defendant immediately before the shooting. Here, there is evidence that there was no imminent threat which required the use of force. In the other cases cited by the defense, the trier of fact determined that the defendant was guilty of voluntary manslaughter, and the issue on appeal was whether the killings were completely justified.

■ We next consider defendant's argument that the jury should not have been instructed on the use of force in self-defense by one who is the initial aggressor. Over defendant's objection the jury was given Illinois Pattern Jury Instruction, Criminal, No. 24—25.09 (2d ed. 1981), which states:

"A person who initially provokes the use of force against himself is justified in the use of force only if

[1] the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person;

or

[2] he in good faith withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

Defendant does not dispute that the instruction is an accurate statement of the law. He contends only that there was no evidence to support it. We disagree.

Defendant testified essentially that he shot Gardner and Coleman after someone from a group of people behind them threw something at him which hit him on the lip. Yet, he also testified that he had already approached Gardner and Coleman and drawn his gun. The jury might have concluded under these circumstances that defendant's actions provoked the use of force by someone in the group. (See *Ellis* (where during heated argument, defendant picked up a gun and fired a warning shot, jury could have determined that he provoked force subsequently used against him).) Where there is a question as to whether the defendant was the initial aggressor, the giving of such an instruction is proper. *People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409; *People v. Crue* (1977), 47 Ill. App. 3d 771, 362 N.E.2d 430.

■ We next consider defendant's argument that our supreme

court violated its own rules and his constitutional right against double jeopardy by entering an order in the exercise of its supervisory jurisdiction requiring the trial court to sentence him to natural life imprisonment. Defendant raised these arguments in the proceedings before our supreme court. That court rejected the contentions. It is fundamental that the appellate court is without authority to overrule the supreme court, or to modify its decisions. (*In re R.P.M.* (1983), 113 Ill. App. 3d 376, 447 N.E.2d 492.) Accordingly, we must abide by our supreme court's decision on these issues. Defendant seeks to avoid this result insofar as his argument is premised on the constitutional prohibition of double jeopardy in relying on a decision of the United States Supreme Court (*Arizona v. Rumsey* (1984), 467 U.S. 203, 81 L. Ed. 2d 164, 104 S. Ct. 2305), which he concedes had come down before our supreme court entered its supervisory order. *Rumsey* was decided on May 29, 1984, and our supreme court entered its order on June 22, 1984. Under these circumstances, we are bound by the supervisory order entered by our own supreme court.

Defendant asserts, however, that no grounds affirmatively appear which would demonstrate that our supreme court considered *Rumsey* in its ruling herein. While they may present an arguable contention, it is not within the province of this court to attempt to instruct our supreme court on a point of law.

Moreover, considering the substance of defendant's *Rumsey* argument, we find it inapplicable here. *Rumsey* grew out of a sentence of death imposed on remand after reversal of an original sentence of life imprisonment. The reversal and remand were occasioned by an error of law committed by the trial court. The United States Supreme Court held that the first and second sentencing hearings were comparable to trial on an issue of guilt and found double jeopardy. No such circumstance is involved here, for there was no second sentencing hearing (trial). The sentence of natural life imposed on defendant resulted only from the fiat of our supreme court interpreting and applying statutory law. The case at bar bears no resemblance to *Rumsey*, and there was no double jeopardy.

■ The defendant's final argument is that section 5—8—1(a)(1)(c) of the Unified Code of Corrections, which requires a sentence of natural life imprisonment where a defendant is convicted of murdering more than one victim, is unconstitutional under the eighth amendment (U.S. Const., amend. VIII) because it precludes consideration of mitigating or rehabilitative factors. This issue was resolved contrary to defendant's position in *People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154. We agree with that decision and conclude that the

enactment is constitutional.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

NASH, P.J., and UNVERZAGT, J., concur.