THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEBRA LYNN GINDORF, Defendant-Appellant.

Second District   No. 2—86—0147

Opinion filed August 10, 1987.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Debra Lynn Gindorf, was charged by indictment with six counts of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (2)) for intentionally and knowingly causing her two children, Christina, age 23 months, and Jason, age 3 months, to ingest an overdose of sleeping pills. Following a bench trial, defendant was found guilty but mentally ill of two counts of murder and was sentenced to the mandatory term of natural life imprisonment required by section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)).

Defendant raises the following issues on appeal: (1) whether the evidence establishes that she was legally sane when she committed the instant offenses; (2) whether she should have been found guilty of voluntary manslaughter instead of murder under the principle of necessity because she acted with the unreasonable belief that her conduct was justified; (3) whether the trial court's refusal to take judicial notice of two court files in the same circuit was reversible error; (4) whether the application of the mandatory natural life sentence to a guilty but mentally ill offender violates the eighth amendment protection against cruel and unusual punishment; and (5) whether a finding of guilty but mentally ill under section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 6—2) renders all sentencing of guilty but mentally ill persons discretionary under section 5—2—6(a) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(a)), making the mandatory natural life statute for the murder of more than one person under section 5—8—1(a)(1)(c) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)) inapplicable to the present case.

The following relevant information was presented at trial. On March 29, 1985, at approximately 6:30 p.m., defendant walked into the Zion police station and stated to Diane Schroeder, a telecommunicator with the Zion police department, that she wanted to turn herself in. Defendant appeared nervous and her hands were shaking. She did not smell of alcohol, was not speaking loudly, and appeared glassy-eyed and trying to control her behavior. Defendant was directed to Ray Nichols, a Zion police detective. She told Nichols her name and stated that she had killed her infant and small child at about 2 a.m. the prior morning. She gave the detective the names and birth dates of her children, the address of her apartment, and the key to her apartment. Although defendant was "wringing" her hands, Nichols did not perceive her to be acting out of the ordinary or to say anything he could not understand.

After waiving her constitutional rights, defendant stated that at about 2 a.m. she took three boxes of Unisom sleeping capsules purchased at a local Jewel store, crushed the tablets, and placed the substance in three piles. She then put a small amount in the baby's formula in a baby bottle, gave an unknown amount to her little girl in a small juice container, and took the rest herself in a drink of Southern Comfort, of which she already had five shots. The children became sick and began vomiting, and she laid them in bed afterwards. She then passed out and woke up at 7:30 a.m., at which time she realized the children were deceased. Defendant then turned on the gas stove, placed a towel over her head and inhaled the fumes, passing out

again. She awoke at 2 p.m., and realizing she was still alive, cut her right wrist with a steak knife and then attempted to smother herself with a pillow. Being unsuccessful at these endeavors, she went to the police. Defendant also stated that she purchased one of the three boxes of Unisom on March 21, 1985, and crushed the 32 tablets at that time. She purchased the other two boxes the night before the incident. She indicated that she knew what she was doing and just wanted to be free and happy, and that she had been planning to kill herself and her two children for about a month.

Three Zion police officers went to defendant's apartment, and upon approaching the apartment smelled a strong odor of natural gas. The entered the apartment, where they discovered the children in the bed, and they detected no vital signs. The cause of death of the two children was later determined as acute overdoses of the drug doxylamine succiate, the active ingredient in Unisom sleeping pills.

Neighbors of defendant in the apartment building who were frequent companions of defendant and were mothers of small children indicated that prior to March 28, 1985, they saw defendant regularly, that they often ate with defendant and her children, that they had reciprocal baby-sitting arrangements with defendant, and that defendant kept her apartment very clean and took good care of her children, keeping them well fed and properly clothed. Defendant, however, was observed to be frequently depressed and after giving birth to Jason on January 3, 1985, became increasingly more depressed. Defendant no longer wanted to do anything with her neighbors and became withdrawn and isolated.

Defendant's marriage was dissolved in June 1984, although she lived with her ex-husband until December 7, 1984. Her ex-husband admitted coming home drunk and getting into verbal and physical altercations with defendant on occasion, stated he has hit defendant in the past, and acknowledged that the ground upon which their marriage was dissolved was physical cruelty. Although her ex-husband stated he could not recall, neighbors testified that he violently attacked defendant, who was eight months pregnant at the time, two weeks before Christmas 1984 while her daughter watched and cried.

Concerning defendant's behavior on March 28, 1985, one neighbor, who saw defendant hours before the incident and unknowingly drove defendant to the store to purchase the two boxes of Unisom capsules, stated that defendant seemed normal and was not depressed, although he admitted he did not know defendant well. Other neighbors, who also saw defendant in the evening prior to the incident and were apparently the last people to see her before she walked

into the police station, observed that she seemed more depressed than usual, not as talkative, and was unusually quiet and looked tired. They also noted as unusual defendant telling her daughter to hug and kiss a neighbor good-bye because they were going home, a request not made by defendant before.

A number of letters and notes written by defendant were recovered from defendant, defendant's apartment, and defendant's ex-husband and introduced into evidence. These included letters to her ex-husband expressing feelings of sorrow for their failed marriage and her decision to do something which might upset him, although this action was not revealed, a self-written will, a letter to her parents apologizing for her actions, and letters to her children expressing her affection for them. In addition, a letter to a friend was also introduced reflecting defendant's mood, her detailed account of what occurred, and reasons why she committed the act.

Lenore Walker, Ed.D., a psychologist with an extensive background in the areas of domestic violence and battered woman syndrome, testified on behalf of defendant that she interviewed defendant on May 10, 1985, to obtain defendant's personal history. She also reviewed the police reports, the witnesses' statements, the various letters, will and notes written by defendant, hospital records, police records, records of prior assaults on defendant, a social and family history, psychological test data, and the results of a Dexamethasone Suppression Test. Based on all of this information, she asserted three diagnoses for defendant: (1) that defendant suffers from post-traumatic stress disorder, specifically, battered woman's syndrome, as a result of the situational disorder of her abusive relationship with her ex-husband, (2) that defendant was afflicted with a major affective disorder, specifically, major psychotic depression, the recurrent type, and (3) that defendant has an underlying borderline personality disorder coming from incomplete personality development.

Walker explained that persons with the latter condition have a sense of self or ego that is so weak and fragile that they slip in and out of psychotic kinds of episodes, that major affective disorder is caused both by the outside stresses of such things as death or divorce and by biochemical factors. She noted that defendant was administered two blood tests (Dexamethasone Suppression Tests) to determine whether any physiological factor was a cause of her depression. The first test, administered in the summer or fall of 1985, indicated that depression-related biochemical imbalances were present in defendant's system, and, after defendant was given various anti-depression drugs, a second test, made in October 1985, was negative.

Walker viewed both that defendant's mood was dramatically improved after the drug therapy and that the test results went from positive to negative as indicating that her depression at the time of the offense had a physiological component. In her opinion, defendant was suffering from more than one mental disease on March 29, 1985, and that defendant was not able to conform her conduct to the requirements of the law.

Sharon Strauss, Ph.D., a clinical psychologist, interviewed defendant and reviewed the same materials that were considered by Walker. Strauss concluded that defendant had a mental disease on March 29, 1985, which she labeled as major depression with psychotic features accompanied by underlying borderline personality disorder. She explained that the combination of major depression and personality disorder can cause extreme psychosis, which, in defendant's case, caused episodic lapses from reality. Strauss joined in Walker's statement that persons afflicted with major depression can appear normal to lay people and stated her belief that defendant was not malingering or faking. Strauss opined that on March 29, defendant was experiencing a psychotic episode and was not able to conform her conduct to the requirements of the law.

In rebuttal, Dr. Ronald Baron, a psychiatrist, testified that he gathered data from defendant on October 30 and November 5, 1985, and reviewed defendant's letters, the police reports, and the reports of the other doctors and mental health professionals. Dr. Baron opined that defendant was suffering from a severe mental illness at the time of the offense, specifically, a major depression disorder, recurrent type, and found that defendant was afflicted by a mixed type personality disorder, with borderline antisocial and avoidant features. He attributed the onset of defendant's mental condition to her stormy marriage and its dissolution and agreed with Walker that the beatings inflicted upon her by her ex-husband had resulted in a post-traumatic stress disorder. Dr. Baron, however, testified that even though defendant suffered from severe mental illness on March 29, she was able to recognize right from wrong and had the ability to conform her conduct to the requirements of the law.

It was stipulated to that during interviews with a social worker at the Lake County jail on April 1, 3 and 5, 1985, defendant showed no signs of stress and was coherent and oriented, and that defendant stated that she had become extremely isolated and bogged down with housework and the children, that she wanted to commit suicide, but believed that if her children remained alive they would lead lives like her own, and that she believed her children were in heaven and

wanted to join them. They also stipulated that the results of the first Dexamethasone Suppression Test administered to defendant were abnormal, suggesting a major depressive episode. It was also stipulated that on January 3, 1983, defendant went to the emergency room of Victor Memorial Hospital complaining that she was assaulted by her husband five days earlier and that she had contusions and abrasions on her head, arms and right knee and was 30 weeks pregnant, and that defendant, on September 15, 1983, was brought to St. Therese Hospital emergency room following a miscarriage, and that her husband was loud, obnoxious, and had a strong odor of alcohol about him, and defendant stated she was frightened of him.

Following the final arguments of the parties, the trial court determined that defendant failed to meet her burden on the insanity issue and found defendant guilty but mentally ill of murder. The trial court found that all the expert testimony was successfully attacked by both sides, and although it did not disregard the testimony, the court determined that the experts' opinions concerning defendant's conduct were secondary to the law witnesses' testimony concerning the events prior to and following the incident. It also took into account defendant's personal history and stormy marriage and considered the letters and notes written by defendant both before and after the incident. The court found that defendant was not insane at the time of the incident but was suffering from a mental illness, in that she had a substantial disorder of thought, mood and behavior which affected her at the time of the incident but did not impair her judgment to the extent that she was unable to appreciate the wrongfulness of her behavior or unable to conform her conduct to the requirements of the law.

Following the denial of defendant's motion for a new trial and constitutional challenge to the applicability of section 5—8—1(a)(1)(c) to the particular circumstances of this case, the trial court concluded that it had no discretion in sentencing defendant under section 5—8—1(a)(1)(c) and section 5—2—6(a) and that section 5—8—1(a)(1)(c) was constitutional and sentenced defendant to a term of natural life imprisonment.

Defendant first contends that her murder convictions must be reversed as the trial court's determination that she was legally sane at the time of the commission of the offenses is not supported by credible expert testimony and is contrary to the only reasonable inference to be drawn from the testimony of the lay witnesses and the physical evidence. In particular, she argues that the testimony of her experts is substantially corroborated by the totality of the other evidence and renders Dr. Baron's conclusion unreliable, and that the testimony of

the lay witnesses amply establishes that defendant had "some sort of depressive disorder" because she lived in a demanding and stressful circumstances likely to trigger a psychotic reaction and acted "shockingly inconsistent with her loving relationship with her children." Defendant also argues that the circumstances of this case are remarkably similar to the factual situation presented in *People v. Arndt* (1980), 86 Ill. App. 3d 744, 408 N.E.2d 757, and she further argues that pursuant to *People v. Palmer* (1985), 139 Ill. App. 3d 966, 487 N.E.2d 1154, her convictions must be reversed as the evidence presented gave rise to a reasonable doubt concerning her sanity.

The State responds that the trial court correctly found that defendant failed to meet her burden of proving insanity because her experts were not sufficiently credible to establish legal insanity and because the testimony of the lay witnesses did not establish that she met the requisite standard. It distinguishes defendant's case authority by pointing out that *Arndt* was decided under the previous statute governing the insanity defense and that *Palmer* involved extremely different factual circumstances. It argues that defendant simply failed to prove by a preponderance of the evidence that she was both mentally ill and could not appreciate the criminality of her acts or could not conform her conduct to the requirements of the law.

In reply, defendant argues that the lay testimony was insufficient to support a finding that she was not insane and makes the argument that a "normal person does not kill her children, spend a day vainly trying to commit suicide and then report the entire episode to the police."

■ A person is not criminally responsible for his conduct if, at the time of such conduct, that person lacks substantial capacity as a result of mental disease or mental defect either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a); *People v. Silagy* (1984), 101 Ill. 2d 147, 168, 461 N.E.2d 415.) On the other hand, a person who was not insane but suffering from a mental illness at the time of the commission of the criminal offense is not relieved of criminal responsibility for the conduct although she may be found guilty but mentally ill. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(c).) The presentation of an insanity defense, however, was changed by the General Assembly in 1984. Prior to 1984, when a defendant introduced evidence of insanity, the State was required to prove that the defendant was sane at the time of the offense beyond a reasonable doubt. See *People v. Silagy* (1984), 101 Ill. 2d 147, 168, 461 N.E.2d 415; *People v. Chatman* (1986), 145 Ill. App. 3d 648, 658, 495 N.E.2d

1067; *People v. Hickman* (1986), 143 Ill. App. 3d 195, 198, 492 N.E.2d 1041.

■■ ■ Following the addition of section 6—2(e) and section 3—2(b), however, both effective January 1, 1984, the burden was placed on the defendant to prove by a preponderance of the evidence that he or she was not guilty by reason of insanity. (Ill. Rev. Stat. 1985, ch. 38, pars. 6—2(e), 3—2(b); see also *People v. Moore* (1986), 147 Ill. App. 3d 881, 884-85, 498 N.E.2d 701; *People v. Hickman* (1986), 143 Ill. App. 3d 195, 198, 492 N.E.2d 1041.) Sanity is a question of fact, and the decision of the trier of fact concerning whether a defendant was sane at the time of the offense would not be reversed unless the decision by the trial court, in a bench trial, is so palpably erroneous as to suggest its basis was passion or prejudice. See *People v. Silagy* (1984), 101 Ill. 2d 147, 169, 461 N.E.2d 415; *People v. Snowden* (1986), 147 Ill. App. 3d 763, 770, 498 N.E.2d 612; *People v. Chatman* (1986), 145 Ill. App. 3d 648, 661, 495 N.E.2d 1067; *People v. Clark* (1981), 102 Ill. App. 3d 414, 418, 429 N.E.2d 1255.

■ Defendant contends that the trial court improperly disregarded the testimony of her experts. She recounts the strengths and weaknesses of the expert testimony below, pointing out the weaknesses of the State's rebuttal expert, Dr. Baron. She also reiterates the testimony of her own experts emphasizing her difficult and troubled personal history and comparing her circumstances to the defendants in *Palmer* and *Arndt*. While defendant concedes that the trier of fact may reject expert testimony that a defendant was insane at the time of the offense and conclude that a defendant was sane solely on the basis of lay testimony (see *People v. Skorka* (1986), 147 Ill. App. 3d 976, 981, 498 N.E.2d 607; *People v. Chatman* (1986), 145 Ill. App. 3d 648, 659, 495 N.E.2d 1067; *People v. Palmer* (1985), 139 Ill. App. 3d 966, 972-73, 487 N.E.2d 1154; *People v. Liberg* (1985), 138 Ill. App. 3d 986, 991, 486 N.E.2d 973) or may accept one expert's opinion over another on the question of insanity so as to resolve contradictions (see *People v. Skorka* (1986), 147 Ill. App. 3d 976, 981, 498 N.E.2d 607; *People v. Palmer* (1985), 139 Ill. App. 3d 966, 972-73, 487 N.E.2d 1154), she argues that the lay witnesses were not really the kind of lay testimony which a court can find to be more relevant than the expert testimony because they did not observe defendant at the time of the offense and because they did not know defendant all her life. She also asserts that the lay witness testimony was insufficient both because the lay witnesses were totally untrained people unable to recognize the very complicated mental disorders defendant had and because their conclusions that defendant was fine were obviously

wrong, as a few hours later defendant killed her children and tried to kill herself.

In *People v. Palmer*, this court reversed the lower court finding of guilty but mentally ill of murder after concluding that, although the trier of fact may believe one witness over another, the State's expert witness on sanity was not credible and the defendant's awareness of the wrongfulness of his conduct was not convincing, thereby demonstrating that a reasonable doubt remained as to the defendant's sanity at the time of the offense. (139 Ill. App. 3d 966, 974, 487 N.E.2d 1154.) Relying on the fact that the State's expert in *Palmer* is the same expert for the State in the present case, defendant argues that this court should again find Dr. Baron's testimony weak and self-contradictory.

*Palmer*, however, is very different from the present case both factually and procedurally. The 32-year-old defendant in *Palmer* stabbed the 14-year-old victim in the neck for no apparent reason while standing in line at a McDonald's restaurant. There was extensive testimony concerning the defendant's past mental history, including hospitalizations and diagnosed schizophrenia. (139 Ill. App. 3d 966, 967-72, 487 N.E.2d 1154.) The *Palmer* defendant also was tried under the burden of proof required prior to 1984. (139 Ill. App. 3d 966, 972, 487 N.E.2d 1154.) Additionally, this court not only found that Dr. Baron's testimony was not credible under the circumstances, but also found that the defendant's experts were corroborated by the lay testimony. (139 Ill. App. 3d 966, 973, 487 N.E.2d 1154.) Further, this court noted that the defendant had an extensive history of mental illness. (139 Ill. App. 3d 966, 973-74, 487 N.E.2d 1154.) Finally, it found that as the State's testimony was unreliable, the State failed to refute the evidence of the defendant's insanity. 139 Ill. App. 3d 966, 974, 487 N.E.2d 1154.

Here, unlike *Palmer*, the trial court gave less weight to all the experts' testimony and reached its conclusion based primarily on the testimony of those people who saw defendant before the incident, the writings of defendant, the essence of her statement to the police, and defendant's troubled personal history. It found this testimony more credible. Additionally, defendant here had no prolonged history of mental illness, the presence of which was relied on by this court in *Palmer* to conclude that there was reasonable doubt concerning the defendant's sanity. Although defendant had a history of personal stress and physical abuse against her which the testimony indicates led to her depression, this is substantially different from the mental illness of the defendant in *Palmer*.

*People v. Arndt* (1980), 86 Ill. App. 3d 744, 408 N.E.2d 757, is

also distinguishable. Although *Arndt* involved the death of a child and the unsuccessful, simultaneous suicide attempt by the mother, the defendant in *Arndt* had a history of hospitalization for mental illness prior to the incident. In addition, two psychiatrists testified that the defendant was suffering from a mental illness and was unable to conform her conduct to the requirements of the law. The State, however, presented no evidence to contradict the conclusions of the defendant's experts. The trial court chose to reject the doctors' conclusions because the actual tests performed on the defendant following the incident did not substantiate the doctors' opinions. (86 Ill. App. 3d 744, 747-49, 408 N.E.2d 757.) Later, the trial court expounded on this determination, stating that it felt that the defendant realized what she was contemplating was wrong, but chose not to seek assistance to thwart her plan. (86 Ill. App. 3d 744, 749, 408 N.E.2d 757.) While the appellate court in *Arndt* did not express its reasoning for adopting the viewpoint of defendant's experts, it did indicate that based on the experts' testimony the defendant presented sufficient competent expert evidence to raise a reasonable doubt as to her sanity at the time of the homicide and that the State did not refute this evidence. 86 Ill. App. 3d 744, 745-50, 408 N.E.2d 757.

Of course, it has already been established that this approach to the burden of proof is no longer applicable. Although *Arndt* did find that the defendant was suffering from a recognized mental illness caused by a chemical imbalance resulting in wide-changing mood changes and can be considered actually similar to this case (86 Ill. App. 3d 744, 749, 408 N.E.2d 752), each case must be addressed on its own facts. Here, unlike *Arndt*, there was no finding of a mental disease as required under the present statute, and there was evidence presented by both sides which reached different conclusions. Additionally, defendant did not have a history of mental problems. Further, in *Arndt*, the question was whether the State met its burden successfully in the trial court, while, here, the question was whether defendant presented sufficient evidence to establish by a preponderance of the evidence that she was not guilty by reason of insanity. *Arndt* is not dispositive of this case.

■ Defendant also incorrectly states that the new statute does not relieve the State of its burden to establish the defendant's sanity beyond a reasonable doubt. There is a presumption that all persons are sane (*People v. Silagy* (1984), 101 Ill. 2d 147, 168, 461 N.E.2d 415), and in order to raise the affirmative defense of insanity, the defendant must prove his insanity at the time of the offense by a preponderance of the evidence. (Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(b),

6—2(e); see *People v. Moore* (1986), 147 Ill. App. 3d 881, 886, 498 N.E.2d 701.) Here, the trial court specifically found the experts' opinions less credible than the lay witness evidence on sanity, listing its reasons, prior to determining that she did not sustain her burden. The evidence indicated that although defendant was depressed, she knew her conduct was wrong and refused to conform her conduct to the requirements of the law. The purchase of Unisom and the preparation of some of the drug one week before the incident, the trial court felt, demonstrated an intent to carry out her plan regardless of the rules. In addition, defendant does not have a history of mental disease; nor did she exhibit qualities of an insane person to those who came in contact with her daily prior to the incident.

■ Although the defense experts on sanity found that defendant was suffering from a psychotic depression and a chemical imbalance, the trial court found that the testimony of the lay witnesses demonstrated defendant's ability to conform her conduct to the requirements of the law at the time of the incident. Lay opinions made shortly before and after an incident that a defendant appears normal may overcome an expert opinion that a defendant is insane. (*People v. Chatman* (1986), 145 Ill. App. 3d 648, 659, 495 N.E.2d 1067; see also *People v. Skorka* (1986), 147 Ill. App. 3d 976, 981, 498 N.E.2d 607.) The extensive testimony which was presented through her neighbors concerning defendant's conduct prior to the incident only indicated that she seemed more depressed, tired, and quiet than usual, but nothing unusual, other than her instructing her children to hug a neighbor, occurred. The testimony concerning defendant's behavior following the incident only indicated that defendant appeared nervous and quiet. Dr. Baron also testified that even though defendant suffered from a severe mental illness on March 29, she could recognize right from wrong and had the ability to conform her conduct to the requirements of the law. Based upon the record, the decision of the trial court that defendant did not meet her burden to establish her insanity by a preponderance of the evidence is not palpably erroneous.

■ Defendant next contends the trial court erred when it found her guilty of murder and not voluntary manslaughter where it was established by all the expert testimony that she believed that it was necessary to kill her children, albeit an unreasonable belief, to avoid the greater injury to the children of forcing them to continue living, after defendant's suicide, their lives doomed to be spent in misery and suffering. She argues that she believed her conduct was justified by reason of necessity, an affirmative defense set forth in section 7—13 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 7—13).

Defendant cites as support *People v. Nobles* (1980), 83 Ill. App. 3d 711, 404 N.E.2d 330, wherein the appellate court stated that the theory that an accused's mental abnormality can create a condition whereby he would have the type of unreasonable belief described in section 9—2(b) is authoritatively recognized in W. LaFave & A. Scott, Criminal Law sec. 42, at 329 (1972). However, the appellate court declined to determine whether this theory has application under the Illinois Code of Criminal Procedure of 1961. (*People v. Nobles* (1980), 83 Ill. App. 3d 711, 713-14, 404 N.E.2d 330.) Moreover, there is no indication that the defense of necessity was advanced in the bizarre circumstances in *Nobles*, and it is not applicable to this case.

We also find that defendant's reliance on *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380, and *People v. Denson* (1985), 139 Ill. App. 3d 914, 487 N.E.2d 777, is misplaced, as neither case involved an insanity defense nor addressed a theory similar to the proposition argued by defendant here.

We agree with the State that the defense of necessity in section 7—13 is inapplicable under the circumstances here to reduce the offense to voluntary manslaughter. Necessity is defined as follows:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." (Ill. Rev. Stat. 1985, ch. 38, par. 7—13.)

Defendant cites no authority that the defense of necessity would justify the taking of another's life under these facts. To so hold here would sanction conduct which amounts to "mercy killing," a proposition which finds no support in Illinois law.

■ Defendant's third contention is that the trial court's refusal to take judicial notice of the contents of two court files, a criminal case against her former husband for battery against her and a dissolution of marriage case, which included orders of protection issued against defendant's ex-husband, amounted to reversible error because proof that the orders were issued was necessary to support defendant's expert testimony that her mental illness was related to the repeated physical abuse she suffered during her marriage.

The State responds that the trial court's refusal to take judicial notice of the entire court file in defendant's dissolution proceeding does not justify reversal as the information concerning defendant's mistreatment was amply supported in the record below and merely would have been cumulative. In addition, the State points out that ju-

dicial notice of the orders would not have established, only corroborated, that defendant was abused and that the trial judge's hesitancy to take notice of orders which were entered *ex parte* and of which he had no knowledge or recollection of the facts underlying the order is appropriate.

The motion to take judicial notice of the two court files occurred at the close of defendant's evidence. While the trial judge took judicial notice of defendant's former husband's plea of guilty to battery in the criminal case and of the judgment for dissolution of marriage on grounds of extreme and repeated physical cruelty against defendant in the civil proceeding, he refused to take judicial notice of the *ex parte* orders of protection issued against her former husband contained in the dissolution case. In refusing to take judicial notice of the entire file the court also added that he had heard other testimony of the physical abuse inflicted on defendant.

Judicial notice may be taken of factual evidence where the facts are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy. (*Vulcan Materials Co. v. Bee Construction* (1983), 96 Ill. 2d 159, 166, 449 N.E.2d 812; *People v. Davis* (1976), 65 Ill. 2d 157, 165, 357 N.E.2d 792.) Judicial notice of other proceedings in other courts may fall within the judicially noticeable category of facts capable of immediate and accurate demonstration by resorting to easily accessible sources of indisputable accuracy, depending on the nature of the matters sought to be noticed. (See *Vulcan Materials Co. v. Bee Construction* (1983), 96 Ill. 2d 159, 166, 449 N.E.2d 812; *People v. Davis* (1976), 65 Ill. 2d 157, 165, 357 N.E.2d 792.) Here, the trial judge did take judicial notice of the judgments in both of the prior court records. In addition, even assuming without deciding that the *ex parte* orders of protection also should have been judicially noticed, this additional evidence of the orders of protection contained in the court file is cumulative of the extensive trial evidence of physical abuse against defendant by her former husband which was acknowledged here by the trial judge sitting as the trier of fact in this bench trial. On this record, any error in this regard was not prejudicial. See *People v. Carlson* (1982), 92 Ill. 2d 440, 449, 442 N.E.2d 504.

Defendant's fourth contention is that because the mandatory nature of the natural life sentence statute where the accused is found guilty of murdering more than one victim precludes a court from imposing a sentence which is mitigated by the finding that defendant was under a mental illness at the time of the commission of the offense, the application of a natural life sentence to defendant after she

was found guilty but mentally ill amounts to cruel and unusual punishment in violation of the eighth amendment to the U.S. Constitution (U.S. Const., amend. VIII). She argues that the sentence of natural life, the harshest penalty to be imposed short of the death penalty, is disproportionate to the crimes she committed because her mental illness made her less culpable than an unimpaired person who deliberately commits multiple killings. Contending both that the legislature manifested a belief that mental illness is a unique mitigating factor, in that it is the only mitigator incorporated into a judgment, and that a mental illness can be treated, controlled, and cured, defendant argues that it is less likely that she will continue to be a threat to society, requiring her permanent incarceration.

She also asserts that when her sentence is examined against the criteria outlined by the United States Supreme Court in *Solem v. Helm* (1983), 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001, to establish proportionality of sentencing, the imposition of a natural life sentence to a defendant found guilty but mentally ill of murder is unconstitutionally disproportionate and violative of the eighth amendment. Defendant also contends that the Illinois cases rejecting an eighth amendment challenge to the mandatory natural life sentence have not been confronted with the unique interaction between a guilty but mentally ill verdict and the imposition of the natural life sentence and are, therefore, not controlling.

The State responds that defendant's claims are without merit because the mandatory natural life sentencing provision has withstood an eighth amendment challenge in several appellate court decisions, and that the penalty imposed in this case is not disproportionate under *Solem*. In reply, defendant argues that other appellate decisions have recognized that a guilty but mentally ill defendant is not the equivalent of a guilty defendant for sentencing purposes, citing *People v. Gurga* (1986), 150 Ill. App. 3d 158, 501 N.E.2d 767, and *People v. McCumber* (1986), 148 Ill. App. 3d 19, 499 N.E.2d 139.

Section 5—8—1(a)(1)(c) mandates the imposition of a sentence of natural life imprisonment for any person found guilty of murdering more than one victim. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c).) Here, the trial court sentenced defendant to a term of natural life for the murder of her two children.

■ Defendant contends that the sentence is disproportionate to the offense under the three factors of *Solem*. In *Solem*, the Supreme Court determined that when sentences are reviewed under the eighth amendment under a claim of disproportionate punishment, that a criminal sentence must be proportionate to the crime for which the

defendant has been convicted, courts should be guided by objective factors, including: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. (*Solem v. Helm* (1983), 463 U.S. 277, 290-92, 77 L. Ed. 2d 637, 649-50, 103 S. Ct. 3001, 3010-11.) *Solem* involved the imposition of a sentence of life imprisonment without the possibility of parole under a recidivist statute. The defendant had been found guilty of passing a bad check for $100 on the underlying offense. The court found that a natural life sentence for passing a bad check was disproportionately harsh, although the defendant technically qualified for the sentence because of numerous past felony convictions. 463 U.S. 277, 293-94, 77 L. Ed. 2d 637, 651, 103 S. Ct. 3001, 3011.

Defendant, in applying these three factors to her case, argues that the gravity of her crime is lessened by comparison to the commission of the same offense by a person not suffering from a mental illness. Accepting the fact that the second factor is of no utility under the circumstances here, as there is no more serious crime than murder, she maintains that of the three States which have both a mandatory natural life sentence and a guilty but mentally ill verdict, only one other State has applied a natural life sentence to a guilty but mentally ill verdict, noting that this conviction was reversed without the constitutional issue being addressed.

■■ Reliance on *Solem* as being dispositive of the issue has been rejected on various occasions by the Illinois Appellate Court where a mandatory natural life sentence in a murder case was imposed under section 5—8—1(a)(1)(c) (Ill. Rev. Stat. 1985, ch. 1005—8—1(a)(1)(c)). (See *People v. Wilson* (1985), 139 Ill. App. 3d 726, 743, 487 N.E.2d 1015; *People v. Boswell* (1985), 132 Ill. App. 3d 52, 61-62, 476 N.E.2d 1154, *rev'd on other grounds* (1986), 111 Ill. 2d 571, 488 N.E.2d 273; see also *People v. Denson* (1985), 139 Ill. App. 3d 914, 926, 487 N.E.2d 777; *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 593-94, 480 N.E.2d 1147.) Here, unlike the facts in *Solem*, but similar to those in the above cases, the crime involved was the murder of two victims, a crime which defendant readily admits is the most serious and incomparable to any other offense. As such, the first two factors of *Solem* are of no assistance to defendant in asserting her claim. Additionally, comparing the sentence to other sentences available in other jurisdictions is not helpful to defendant, as most jurisdictions do not have a guilty but mentally ill statutory provision, and, instead, most have a mandatory natural life sentence for first degree murder.

██ Next, although the Illinois cases which have addressed the constitutional challenge to the mandatory natural life sentence did not involve a verdict of guilty but mentally ill, defendant ignores the fact that the legislature has determined that an offender found guilty but mentally ill is not relieved of criminal responsibility for his conduct as he did not lack substantial capacity either to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a)(c); see also *People v. Brady* (1985), 138 Ill. App. 3d 238, 251, 485 N.E.2d 1159.) Further, the legislature has determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders. (See *People v. Taylor* (1984), 102 Ill. 2d 201, 206, 464 N.E.2d 1059.) Thus, those statutory factors in mitigation accorded weight in favor of withholding or minimizing a sentence of imprisonment (see Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1) do not prevent the legislature from fixing mandatory sentences for the commission of offenses involving circumstances which the legislature has determined override any mitigating circumstances.

██ The statutory provisions for a guilty but mentally ill finding or verdict (Ill. Rev. Stat. 1985, ch. 38, pars. 6—2, 115—2, 115—3, 115—4) were first enacted in Public Act 82—553, effective September 17, 1981. After a plea or verdict of guilty but mentally ill under those provisions, the inquiry, examination, and treatment of the mental illness is mandated under section 5—2—6 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6). Accordingly, even if a defendant has a mandatory natural life sentence, he is still entitled to treatment under section 5—2—6. If a defendant is found guilty but mentally ill and a natural life sentence is not mandatory, then courts may consider in sentencing a defendant the finding of mental illness as held in cases cited by the defendant. See *People v. Gurga* (1986), 150 Ill. App. 3d 158, 501 N.E.2d 767; *People v. McCumber* (1986), 148 Ill. App. 3d 19, 499 N.E.2d 139.

For the foregoing reasons, we find defendant's argument regarding the unconstitutionality of her sentence under these circumstances to be without merit.

Defendant's final contention is that the trial court improperly concluded that it did not have discretion in imposing a natural life sentence. She argues that the finding of guilty but mentally ill afforded the trial court the discretion pursuant to section 5—2—6(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(a)) to sentence to a lesser term of imprisonment.

Section 5—2—6(a) states, in pertinent part, that the court *may* im-

pose any sentence on a defendant found guilty but mentally ill which could be imposed pursuant to law upon a defendant who had been convicted of the same offense without the finding of mental illness. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(a).) Defendant relies on the inclusion of the word "may" in the statute to argue that the sentencing court has the discretion to impose any sentence for the offense it deems appropriate. Defendant's argument is premised on the fact that a verdict or finding of guilty but mentally ill makes the offender substantially less culpable for the commission of the offense because of the mental illness. This premise, however, is contrary to the language of section 6—2(c), which specifically states that a defendant found guilty but mentally ill is no less responsible for the offense. (See Ill. Rev. Stat. 1985, ch. 38, par. 6—2(c); *People v. Brady* (1985), 138 Ill. App. 3d 238, 251, 485 N.E.2d 1159.) As stated in *People v. Hennessey* (1986), 143 Ill. App. 3d 826, 828, 493 N.E.2d 658, "[u]pon a plea of guilty but mentally ill, a trial court is required to impose any appropriate sentence for the offense which could have been imposed on a defendant convicted of the same offense without a finding of mental illness." (143 Ill. App. 3d 826, 828, 493 N.E.2d 658.) It does not reduce a defendant's culpability for the offense or relieve him of criminal responsibility. *People v. Brady* (1985), 138 Ill. App. 3d 238, 251, 485 N.E.2d 1159.

▮▮ A well-established principle of statutory construction is that a specific statutory provision controls as against the general provision on the same subject. (See *People v. Singleton* (1984), 103 Ill. 2d 339, 345, 469 N.E.2d 200; *Sierra Club v. Kenney* (1981), 88 Ill. 2d 110, 126, 429 N.E.2d 1214; *People v. Bailey* (1983), 116 Ill. App. 3d 259, 263, 452 N.E.2d 28.) Section 5—2—6(a) is a general provision which, in effect, directs a sentencing court to look to the underlying offense to determine the available sentence. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(a).) The underlying offense here was the murder of two individuals. Under the appropriate sentencing provision, section 5—8—1(a)(1)(c) specifically states that the only sentence available shall be a natural life sentence. No factors in mitigation can be considered.

▮▮ The trial court has an obligation to order the criminal penalties mandated by the legislature. (*People v. Wade* (1987), 116 Ill. 2d 1, 6, 506 N.E.2d 954.) The legislature has authority to define crimes and establish the nature and extent of criminal penalties, and a court exceeds its authority if it orders a lesser sentence than is mandated by statute, unless "the [mandated] penalty shocks the conscience of reasonable men." (*People ex rel. Ward v. Salter* (1963), 28 Ill. 2d 612, 615, 192 N.E.2d 882; see also *People ex rel. Carey v. Bentivenga*

(1981), 83 Ill. 2d 537, 542, 416 N.E.2d 259.) A trial court, upon determination of guilt, has no authority to assess a fine or impose a sentence other than that provided by statute. *People v. Wade* (1987), 116 Ill. 2d 1, 6, 506 N.E.2d 954; see also *People ex rel. Daley v. Suria* (1986), 112 Ill. 2d 26, 38, 490 N.E.2d 1288.

Moreover, defendant concedes that if her interpretation of section 5—2—6(a) is correct, which would permit the trial court in its discretion to not follow the mandatory sentencing provision for murder in section 5—8—1(a)(1)(c), then the court may sentence a guilty but mentally ill defendant found guilty of murder to *any* sentence authorized under the Code, including probation or conditional discharge. In essence, all guilty but mentally ill defendants would not be subject to the specific sentencing provisions for the particular offenses of which they were convicted, but could be given any sentence at the discretion of the trial judge.

The legislature could not have intended such a result. In construing statutes, the courts presume that the General Assembly, in passing legislation, did not intend absurdity, inconvenience, or injustice. (*People v. Steppan* (1985), 105 Ill. 2d 310, 316, 473 N.E.2d 1300.) Where several constructions may be placed upon a statute, the court should select that interpretation that leads to a logical result and avoid that which would be absurd. (*People v. Mullinex* (1984), 125 Ill. App. 3d 87, 89, 465 N.E.2d 135.) We conclude that the use of the word "may" in section 5—2—6(a) indicates that the sentencing options for a guilty but mentally ill defendant are as broad as those for one who committed the same offense absent a finding of mental illness, but no broader. Thus, the trial court correctly determined that applying section 5—8—1(a)(1)(c), the appropriate sentencing provision under the facts here, it had no discretion except to impose the mandatory natural life sentence for murder.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

UNVERZAGT and WOODWARD, JJ., concur.