THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CAROL ARNDT, Defendant-Appellant.

First District (4th Division)  No. 79-1327

Opinion filed July 24, 1980.

Patrick T. Murphy, of Goldberg & Murphy, Ltd., of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Mark X. Van Cura, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Following a bench trial defendant, Carol Arndt, was convicted of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1), and sentenced to a term of 20 years. On appeal defendant contends that (1) the State failed to sustain its burden of proof with regard to her defense of insanity, and (2) the trial court's extensive examination of several defense psychiatrists was unnecessary and prejudiced defendant.

The facts surrounding the incident in question are not in dispute. On August 8, 1978, defendant's husband arrived home and discovered defendant and their 6-year-old son (deceased) in the car which was parked in the closed garage. Defendant was in the front seat and deceased was in the back seat. Deceased had died of carbon monoxide poisoning.

Assistant State's Attorney Michael Ward testified that on August 8, 1978, he went to a hospital where he received a suicide note written by defendant to her husband which police officers had obtained from defendant's residence. This note was introduced into evidence by stipulation. In the note, which was written the day before, defendant stated that she could not live up to the expectations of her husband or anyone else; that she had made an emotional cripple and frustrated person out of deceased; that her husband was a good man deserving of a better life; that she and deceased were "getting off from around your neck before we drag you down too"; and that her actions were being done before she and deceased brought disgrace to her husband.

After speaking to police and reading the note, Ward went to see defendant who was in the hospital. When he introduced himself to defendant, she responded that she was "really in trouble." Ward advised defendant of her *Miranda* rights, which she said she understood, and she proceeded to give an oral statement. Defendant then indicated that she would give Ward a written statement and her attending physician indicated that there was no reason why this could not be done. The statement was taken at 11 p.m. on August 8, 1978, transcribed and then signed by defendant. It was admitted into evidence.

In her statement defendant explained that she got up that morning, dressed, closed the windows in her home because of the warm temperature and turned on the air conditioner in order that the house would be cool when her husband came home. She then woke deceased and dressed him. Thereafter she took deceased and her cat into the garage about 9:20 a.m. She put her son in the car and turned on the car

ignition in the closed garage. Deceased was in the back seat, but he then came to the front seat; the cat was also in the car. They remained seated in the car during this time. Deceased attempted to leave on one occasion about 30 minutes later, but she talked to him about his upcoming birthday party and asked him to stay; deceased complied. At this juncture the engine stopped, and defendant could not restart it. Defendant got out of the car and told deceased to get out, but he did not move. Defendant then collapsed on the garage floor. She lay there for some time before trying to get into the car. At this point the paramedics arrived.

In her signed statement defendant explained that the reason for her action was that she wanted to kill herself and her son because that type of action seemed to be "epidemic." She said that when she began her action she was intent on killing only herself, but she knew that her actions would also kill deceased.

Dr. James Cavanaugh, a psychiatrist, testified for defendant on direct examination that she had been his patient since her hospitalization on August 10, 1978. She was discharged from in-patient treatment on November 10, 1978. Initially, Dr. Cavanaugh saw defendant daily during this period of time. Gradually, he reduced this frequency to several times each week. He has also continued to see defendant on a regular out-patient basis since her discharge.

Dr. Cavanaugh explained the series of tests given to defendant while she was hospitalized and his examination of her prior psychiatric history. He concluded that defendant was suffering from a chronic manic-depressive illness which began in 1969 when she was briefly hospitalized for manic or euphoric behavior; this condition was classified as a mental illness. He explained that this illness is characterized by clinical mood changes of either continuous or intermittent frequency. During these periods an individual's mood would fluctuate between abnormal euphoria and extreme depression possibly with suicidal overtones. This illness disrupted daily living and interfered with judgment and concentration.

While all people experience periods of elation and depression, Dr. Cavanaugh explained that the mood changes of a manic-depressive will vary in depth from 2 to 20 times more than a normal individual. He also indicated that a person with such illness, who is in the depressed cycle, might experience changes in sleep patterns, eating habits and daily activity routines. Such condition might cause acute suicidal symptoms.

Dr. Cavanaugh was of the opinion that at the time of the incident in question defendant was in a mood cycle of acute depression which may have begun in June 1978 resulting in an increase of suicidal tendencies and culminating in her attempted suicide on August 8, 1978. Dr. Cavanaugh, when he first saw defendant two days after the attempted suicide,

concluded that defendant was emerging from her depressive cycle to a manic behavior pattern characterized by hyperactivity and lack of appreciation for reality.

Dr. Cavanaugh further stated that a person in defendant's condition might demonstrate a significant impairment in judgment by inclusion of her child and cat into her depressive condition. And he was of the opinion that, when she attempted suicide, she was insane because she could not appreciate the criminality of her conduct or conform her actions to the requirements of law.

On cross-examination Dr. Cavanaugh testified that a manic-depressive condition is caused by a biochemical imbalance.[1] He also stated that an untreated manic-depressive might experience episodes of clinical psychosis at the end of each mood cycle which involve an inability to appreciate her behavior and, at times, to suffer hallucinations. He reiterated his diagnosis, which had been formed after he had read defendant's suicide note and statement given to the Assistant State's Attorney.

Dr. Cavanaugh was of the opinion that about 9 a.m. on August 8, 1978, defendant was acutely depressed, but to an untrained observer her condition might not be detected because defendant might not appear to be highly disorganized or engaged in erratic behavior. Specifically, in reference to defendant's seemingly lucid behavior in the hospital after her attempted suicide, Dr. Cavanaugh explained that the carbon monoxide poisoning and emergency treatment she received was possibly "equivalent of [a] psychological shock treatment" which caused her to break from her depression and gave her an awareness of events. However, during this time defendant was switching to the manic phase of her condition.

The trial court then extensively questioned Dr. Cavanaugh, and defense counsel stated that he did not object. The court's questions were directed toward whether a person who underwent this mood change would still be able to rationalize whether her conduct was proper. Dr. Cavanaugh said that if a person is extremely depressed she might lose all sense of reasoning. In explaining the rationale why defendant may have chosen to kill her son rather than an adult Dr. Cavanaugh indicated that, as defendant regressed from reality, she incorporated other members of her family in her mental processes as a severe manifestation of her disordered mood and impairment of her judgment to a point of being delusional. Thus defendant came to believe that the only way to deal with her life was to commit suicide without regard to the morality of her actions.

---

[1] At the time of trial defendant was taking medication to stabilize a chemical imbalance. She also was undergoing psychotherapy.

Dr. Gilbert Bogen, a psychiatrist, interviewed defendant about three months after the incident in question and reviewed her medical records in conjunction with the present case. He concluded that defendant was insane at the time of her attempted suicide based on her manic-depressive illness. His explanation of such illness was generally in substantial accord with the description given by Dr. Cavanaugh. He explained that during certain periods of this illness a person might knowingly make a decision to act, know she is committing the act, yet be unable to conform her action to the requirements of law. Further, in regard to the events of August 8, 1978, Dr. Bogen indicated that defendant probably did not even direct her attention to whether her conduct was right or wrong because her focus was on dying.

Dr. Bogen speculated concerning defendant's motivation in taking her son and cat into the garage. He suggested this conduct could evidence defendant's desire to have someone accompany her to another existence or that she was afraid to die alone. He also expressed the view that a decision to commit suicide does not demonstrate that one is sane because in defendant's circumstance she was severely depressed.

On cross-examination Dr. Bogen testified that he reached his conclusion concerning defendant's sanity after his initial examination, apparently without consideration of her suicide note and written statement. However, after later reading them, he said that these items only strengthened his opinion. In regard to whether defendant showed that she was coherent when she exhibited a plan for suicide, Dr. Bogen stated that she was coherent only in relation to her illness.

The trial court then directed numerous questions to Dr. Bogen. He reiterated that he first saw defendant on October 30, 1978. His report compiled at that time stated that defendant may have been able to appreciate the criminality of her act, and Dr. Bogen indicated that his use of the term "may" indicated that at the time he really did not know. But Dr. Bogen persisted in his opinion that defendant could not conform her conduct to law.

Further Dr. Bogen indicated that defendant was in a manic-depressive state which reached a point of hopelessness. She would not have thought of killing her husband because of her own self-depreciation. But she may have thought of killing her son and cat because she believed that they too were worthless. Dr. Bogen conceded there were no medical tests to show if she had homicidal tendencies toward others.

After closing arguments the trial court said that it could not agree with the psychiatric evaluation because the evidence showed that defendant knew what she was doing. The court remarked that although the psychiatrists believed defendant could not conform her conduct to law, the actual tests performed established no standard to substantiate this

position. In argument on defendant's post-trial motion the trial court expounded on its prior determination by saying that defendant realized what she was contemplating was wrong, yet she took no action in seeking assistance from her husband or others to thwart her suicide plan.

■■ Defendant now argues that the State failed to meet its burden of proof with regard to the defense of insanity thereby requiring reversal of her conviction. A person is considered insane and not legally culpable for his actions "if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(a).) In order to advance this defense defendant must introduce sufficient evidence to establish a reasonable doubt of sanity; the State then bears the burden to prove that defendant was sane beyond a reasonable doubt. (*People v. Foster* (1979), 76 Ill. 2d 365, 378-79, 392 N.E.2d 6.) The question of defendant's sanity was for the trial court, as trier of fact, to determine, and its decision will not be set aside unless the evidence raises a reasonable doubt of defendant's sanity. *People v. Ward* (1975), 61 Ill. 2d 559, 568, 338 N.E.2d 171.

Defendant contends that the trial court disregarded the psychiatric testimony because there appeared to be a suicide plan which negated the defense of insanity. The State relies on the fact that it was not required to introduce expert testimony to refute defendant's contention. (*People v. Lono* (1973), 11 Ill. App. 3d 443, 448, 297 N.E.2d 349.) It maintains that defendant's conduct reflected deliberate, rational behavior as shown by her comment to the Assistant State's Attorney that she was in trouble and her subsequent written statement indicating a keen awareness of the situation.

We believe the record convincingly establishes that at the time of the homicide defendant was suffering from a recognized mental illness which was caused by a biochemical imbalance and which caused a manic-depressive state. This condition resulted in wide-ranging mood changes evidenced by periods of high euphoria and deep depression. Both psychiatrists also expressed the opinion that defendant could not conform her conduct to the requirements of law at the time she attempted to commit suicide, and Dr. Cavanaugh added that defendant did not appreciate the criminality of her conduct. Further, from the trial court's comments it does not seem that the court questioned the credibility of the psychiatrists, but rather that it drew different conclusions than they did, particularly from defendant's failure to seek assistance to prevent her suicide attempt.

Dr. Cavanaugh began his initial treatment of defendant less than two days after the occurrence, and he was in an excellent position to evaluate

her condition which had apparently existed for nearly a decade. His testimony refutes the State's position that defendant was not insane as shown by her lucidity at the hospital. It was his opinion that the suicide attempt had shocked defendant back to reality, but a short time later she regressed into a manic condition. No evidence was presented to contradict this conclusion. Further, the psychiatric testimony explained defendant's actions in not seeking assistance because of her severe depressed condition and suicidal tendencies. There is substantial, reputable evidence in the record that defendant's mental processes were so gravely impaired that on August 8, 1978, she lacked the ability to conform her conduct to the requirements of law, and the record also indicates that defendant may also not have been able to appreciate the criminality of her actions.

■ We are of the opinion that there exists a reasonable doubt of defendant's sanity at the time of the homicide. Accordingly, we need not reach defendant's second contention. We reverse the judgment of the circuit court and remand the matter to that court for entry of a finding of not guilty by reason of insanity. The court is then directed to proceed in accord with section 5—2—4 of the Unified Code of Corrections concerning such disposition. Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—4.

Reversed and remanded.

JOHNSON and JIGANTI, JJ., concur.