2020 IL App (1st) 180886-U

Fifth Division
September 11, 2020

No. 1-18-0886

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 15 CR 9789 |
| WOJCIECH SADELSKI, | ) ) | Honorable Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm defendant's convictions for first degree murder and attempt murder. The circuit court's findings that defendant was guilty but mentally ill were not against the manifest weight of the evidence.

¶ 2     At the time of his arrest, Wojciech Sadelski was in the middle of a residential street, wrestling with his brother Piotr for control of a bloody claw hammer. Shortly thereafter, police found the body of their mother, Maria, half naked and lying facedown in a pool of blood. Defendant was subsequently tried and found guilty but mentally ill of first degree murder and

attempt murder, over his contention that he was not guilty by reason of insanity. We affirm the convictions.

¶ 3                                    BACKGROUND

¶ 4     The first witness at defendant's bench trial was his brother Piotr. Piotr testified that, he was living in the basement of his parents' house. Defendant used to live in the house as well, but had moved out several weeks earlier. Piotr testified that although he and defendant had a normal relationship as children, they had not been on speaking terms for the last several years.

¶ 5     On the night in question, Piotr returned home after work. He noticed that his mother's car was parked near the house, but the lights were off and the front door was locked. When there was no response to his knocks at a front window, Piotr walked around to the back door and let himself in. As he entered the kitchen, he felt a hammer blow on his head. Piotr testified that he immediately recognized defendant and that defendant then hit him repeatedly with the hammer. Piotr attempted to fight back, and after almost ten minutes of fighting, Piotr was able to knock defendant to the ground and break for the door. Defendant grabbed at his shirt, but Piotr was able to slip out of it and run to a neighbor's house.

¶ 6     Piotr testified that after he called the police from the neighbor's phone, he realized that he should check on his mother, so he started walking back to the house. As he approached, he saw that defendant was now behind the wheel of their mother's car. He heard a "big acceleration" and had to jump over the hood of the car to avoid being run over. The car went past Piotr, through the wall of a neighbor's garage, and into the adjacent yard.

¶ 7     Piotr testified that defendant climbed out of the car with the hammer still in his hand and began chasing him down the street. Piotr eventually fell, and defendant caught up to him and

resumed beating him with the hammer. Piotr was able to grab the hammer, and for some time each man had one hand on the hammer. Then, a police car arrived. Defendant immediately stopped attacking Piotr and released the hammer. Defendant then told Piotr that he was lucky that the police arrived.

¶ 8    Still worried about his mother, Piotr led a police officer to the house. The two separated and searched the house for Maria. Piotr soon overheard the police officer use his radio to report "a person dead, a female."

¶ 9    On cross-examination, Piotr testified that he and defendant had previously been employed as construction workers by their older brother Mariuz. During that time, defendant accused Piotr of urinating in his shoes. Piotr also testified that defendant "chang[ed] emotionally" during that time. Piotr had, around that time, told his parents that defendant was a "ticking time bomb" and that "he is going to kill us some day." Piotr said that defendant "acted like a psychopath".

¶ 10    The next witness was Officer Rodrigo Lopez of the Chicago Police Department. Lopez testified that, on the night in question, he received a dispatch about a "domestic disturbance with a mental." On his way to the Sadelski house, Lopez was "waved down" by two people who had seen "two guys * * * fighting with a hammer." When Lopez came upon the brothers, each had one hand on the hammer. Defendant was using his free hand to punch Piotr. Lopez drew his sidearm and ordered the men to drop the hammer. Defendant immediately complied and Piotr threw the hammer aside. As he was being arrested, defendant said to Lopez, "He did it."

¶ 11   Lopez then followed Piotr to the house to check on Maria. While Piotr searched on the first floor, Lopez went down into the basement. There, he found a woman, lying facedown in a puddle of blood, wearing nothing but denim pants.

¶ 12   The parties then stipulated that, if called, a forensic investigator would testify that he recovered two lengths of metal pipe, a blood-stained boning knife, and a blood-stained hammer from the scene of the crimes. The parties further stipulated that, if called to testify, forensic scientists would testify that blood on the recovered items and on defendant's shoes matched Maria's DNA.

¶ 13   The final witness in the State's case-in-chief was Dr. Benjamin Soriano of the Cook County Medical Examiner's Office. Dr. Soriano testified that he examined the body of Maria and identified several blunt-force and puncture injuries to the head, consistent with blows from both ends of a claw hammer. Dr. Soriano also identified injuries consistent with blows with a pipe or other cylindrical object, as well as injuries consistent with defensive wounds.

¶ 14   After the court denied defendant's motion for a directed verdict, he called forensic psychiatrists Dr. Fidel Echevarria and Dr. Roni Seltzberg to testify in support of his insanity defense. In rebuttal, the State called psychologists Dr. Brian Curran and Dr. Christopher Cooper who opined that defendant was not insane at the time of the crimes. Each of the four experts had personally examined defendant and had reviewed defendant's previous medical records, an electronic recorded interview (ERI) of defendant after his arrest, and each other's reports.

¶ 15   The medical experts testified that defendant's medical records indicated that he was hospitalized approximately a year before the date in question because he had called 911 to report that he was suicidal. When he arrived at the hospital, defendant was "aggressive, agitated and

screaming," and was given antipsychotic medication. At the hospital, defendant tested positive for cannabis, and his brother reported he "had been paranoid and was having some anger issues." Defendant reported that he had called 911, not because he was suicidal, but because he harbored a belief that the police and FBI were spying on him. Defendant was examined by a psychiatrist, prescribed antipsychotic medication, and released after a few days because he did not qualify for involuntary admission.

¶ 16    Through the testimony of the medical experts, the circuit court heard defendant's own account of the alleged crimes and the events leading up to them. Defendant variously told the doctors that he began hearing voices in his head "some time prior to the murder," when he was 15 or 16 years old, or "every day since he was 17 or 18." There appeared to be at least two different voices, one male and one female. Defendant also reported to the doctors that he had an extensive history of drug use, although his reports to the various doctors were not identical. He admitted to using cannabis daily, as well as drinking alcohol and experimenting with PCP, cocaine, and hallucinogens. To Dr. Cooper, although not to the other doctors, he admitted that he had previously been addicted to cocaine but had quit due to its effect on his exercise routine. He told Dr. Cooper that "had money but *** didn't want to spend it on rent." Rather, he preferred to spend the money on cannabis.

¶ 17    Defendant told the doctors that some weeks before the alleged crimes, he had moved out of his parents' house and began living in a park. He had left the family home because he believed that Piotr had urinated in his shoes and his iced tea, and that his family always sided with Piotr when they fought. He also claimed that he had severe, recurring headaches when in the presence of his brothers. While living under a bridge in the park, defendant used park facilities to shower

and groom himself. All the while, defendant paid his cellphone bill, took care of his belongings, and played pick-up basketball. He also remained employed in construction and regularly took public transportation to work.

¶ 18     On the morning of the crimes, defendant took Chicago Transit Authority (CTA) trains to his employer's house. He told two of the doctors that he had decided to quit his job because he had formed the belief that if he went to Canada, the voices and his headaches would stop. He claimed that, on the way to his employer's house to pick up his final paycheck, he heard a voice telling him to kill his boss. Defendant, however, decided not to kill his employer; he collected his check and took the CTA back to his parents' house. On the way, defendant called and left a message for his drug dealer.

¶ 19     Defendant told the doctors that, while on the train, he thought he heard a woman tell him to kill his brother Piotr. He concluded that if he killed Piotr, the voices and the headaches would stop. Defendant went to his parents' house to lie in wait for Piotr. After some time, the drug dealer returned defendant's call. He left the house to meet with the dealer and buy $20 worth of cannabis. Defendant then returned to the house, smoked the cannabis, and watched music videos.

¶ 20     While waiting for his brother, defendant heard his mother enter the house. He hid from her, but eventually came out of his hiding spot when he thought that she had gone. Defendant told Dr. Curran that his mother asked him to move back into the family home, but that he still had a "grudge" against his brother for urinating in his shoes. Defendant also claimed to hear voices telling him "to hit [his mother], to hurt her, to kill her." He did not remember hitting her, but he knew that he was bloody and that he had killed her.

¶ 21    Defendant told Dr. Seltzberg that, after he killed his mother, he looked out a window and saw a little girl who told him that Piotr had molested her. He also claimed to have heard a voice telling him that Piotr was on his way home and that he should wait for him with the hammer. Defendant related that he attacked Piotr when he came in the back door, and that after wrestling for some time, Piotr was able to get away.

¶ 22    Defendant claimed that a voice then told him to get into his mother's car and leave. Once in the car, however, he saw Piotr and decided to run him down. He tried to hit Piotr with the car but crashed into a neighboring garage. He told the doctors that he got out of the crashed car and chased Piotr on foot and caught up to him when he fell. He continued to fight with Piotr until the police arrived. He reported that a voice told him to hit the police officers, but he decided not to. Defendant reported to Dr. Cooper that, after his arrest, a voice told him to lie to the police and tell them that Piotr had killed Maria.

¶ 23    Dr. Echevarria diagnosed defendant with "schizophrenia multiple episodes" that was "currently in partial remission with medication" as well as cannabis use disorder. He opined that defendant was insane at the time he committed the crimes. In his opinion, defendant's actions were "psychotically motivated" and were the result of defendant's "persecutorial delusional thoughts." When questioned by the court, Dr. Echevarria acknowledged that, at no point during the ERI did defendant appear to be reacting to hallucinations.

¶ 24    Dr. Seltzberg, opined that defendant suffered from a "chronic psychotic mental illness," specifically, schizophrenia. She also opined that he suffered from cannabis use disorder. Although she acknowledged that a person with schizophrenia may "absolutely" be legally sane, she opined that defendant was not sane at the time of the crimes.

¶ 25    Dr. Curran diagnosed defendant with "[u]nspecified schizophrenia spectrum and other psychotic disorder, currently in remission" as well as cannabis use disorder, but opined that defendant was legally sane at the time of the crimes. In particular, he found it noteworthy that defendant "provided a very detailed logical and goal directed account of his movements and activities" on the day of the crimes. Dr. Curran also noted that the ERI, having occurred so close in time to the crimes, was the best evidence of defendant's mental state at the time. Dr. Curran opined that defendant did not show any signs of psychotic symptoms during the ERI. Moreover, Dr. Curran expressed doubt that defendant suffered from "true auditory hallucinations" at all, based on his apparent lack of distress during his self-reported hearing of voices. He also opined that defendant's apparent remission may be attributable to his sobriety from cannabis rather than his current regimen of medication. Dr. Curran administered a written test called the Minnesota Multiphasic Personality Inventory (MMPI) to evaluate Wojciech for personality disorders. Although that test usually takes thirty minutes to complete, defendant took nearly two hours. Concerned by the length of time defendant spent on the test, Dr. Curran also tested defendant's reading comprehension level. Although English is not defendant's first language and his reading and comprehension levels were at second and sixth grade levels, respectively, Dr. Curran stated that the MMPI results were not invalid. He did state, however, that the test results should be interpreted with caution.

¶ 26    Dr. Cooper also opined that defendant was legally sane at the time of the crimes. Dr. Cooper diagnosed defendant with "cannabis use disorder; second, stimulant or cocaine use disorder; third, unspecified personality disorder with antisocial and paranoid features" and "finally fourth rule out history of substance induced psychotic disorder." Dr. Cooper put great

weight on defendant's inconsistent self-reporting of drug use. He also relied on statements by Piotr and defendant's sister that they had never heard defendant complain of hearing voices until after the crimes. Like Dr. Curran, Dr. Cooper also administered a version of the MMPI. Dr. Cooper testified that the MMPI has built-in validity scales to help identify malingering or inconsistent responses, whether intentional or as the result of reading or comprehension difficulties. Dr. Cooper testified that the validity scales did not indicate any particular reading or comprehension problems, but did show that defendant approached the test in "a significantly defensive manner in that he attempted to portray himself in an unusually favorable light by claiming to be unrealistically virtuous." Consequently, he explained, the MMPI results had to be "interpreted with great caution if at all." Ultimately, he "made the determination to interpret [the results] very conservatively so as to not misconstrue the information." He explained that the results were consistent with "a very severe personality disorder such as antisocial personality disorder or paranoid personality disorder."

¶ 27    Aside from the results of the MMPI, Dr. Cooper relied on defendant's own account of his actions that day. He found it significant that defendant was able to navigate public transportation and conduct a drug deal without any problems. "Somebody who is acutely and floridly and significantly psychotic as indicated by some of the other examiners," Dr. Cooper opined, "would likely have difficulty taking a train, switching train lines, interacting with people." He also interpreted defendant's responses to the police in the ERI "as facetious, oppositional, inconsistent, sarcastic responses."

¶ 28    Dr. Cooper also relied on an interview of Piotr by a social worker. Piotr reported to the social worker that he had considered defendant "a ticking time bomb" and that they frequently

got into "nasty fights." Piotr reported that defendant had threatened to kill him several times over the preceding few years. He also told the social worker that defendant had a poor relationship with Maria. Defendant believed that Maria always sided with Piotr, and he argued with her frequently about defendant's cannabis use in the house. Piotr had also reported that, when defendant confronted him about urinating in his shoes and iced tea, Piotr had told him that he "loved it". Dr. Cooper testified that this reaffirmation of defendant's belief about Piotr harassing him changed defendant's belief from a paranoid delusion to a reality based belief. Dr. Cooper opined that this longstanding pattern of enmity cut against defendant's claim that he was acting on insane delusions on the day of the crimes.

¶ 29   The State also called Roger Murphy, one of the Chicago police detectives who had conducted the ERI. He testified that, during the interview, defendant did not appear to be responding to anyone who was not in the room. He also testified that defendant never mentioned Piotr urinating in his shoes. The State also introduced the ERI into evidence and played portions of it in open court.

¶ 30   The approximately six-hour ERI shows detectives questioning defendant about the crimes. During the first part of the interview, defendant looks at the ground and often does not respond to questions. For the most part, his responses are that he does not know or does not remember. Defendant also responds with occasional outbursts, such as "why don't you just throw me in jail?" After the detectives leave, defendant lies down and appears to sleep until they return.

¶ 31   When the detectives return and continue the interview, defendant jokes with them about letting him go and saying that he "jumped them". Unlike during the first portion, he looks at the

detectives during this part of the interview. When asked about crashing the car through the neighbor's garage, defendant laughs and says, "I think I'm possessed or something." Then, when asked if he remembered killing his mother, he responds, "I think you guys killed her." When asked how he feels about his mother being murdered, he responds "why does there have to be an emotion? I have no reaction." Defendant goes on to say that the detectives made him do it by putting something in his head and that he wants a brain scan "to check if there's been anything unusual in [his] head."

¶ 32    Later in the interview, defendant says that killing his mother "was the time of [his] life." He goes on to repeat his claim that the detectives put something in his head. He then asks for a gun and to be let go, requests which the detectives deny. When asked if he remembers attacking Piotr, he responds "I don't have a f*** brother." Again, he states that the detectives "set [him] up." Shortly before the end of this portion of the interview, defendant says that he remembers a voice, but does not elaborate. A while after the detectives leave the room, defendant says to himself, "why do you bother me, man?"

¶ 33    When the detectives return, they ask defendant about previous threats against Piotr. When offered the chance to speak to Piotr, defendant says that he can come into the interrogation room. Piotr enters with the detectives, his hair still matted with blood. Defendant stands up and advances toward Piotr. The detectives tell him repeatedly to sit down, but he continues to move forward. The detectives hurry Piotr out of the room and defendant says, "You guys are f*** sick."

¶ 34    The detectives return without Piotr, and ask why defendant is so angry with him. Defendant mocks Piotr for crying and repeatedly calls him a "f*** scumbag" and child molester.

He also alleges that his mother was a "sick f*** whore" who knew about Piotr molesting children and protected him. When asked why he did not report Piotr's alleged child molestation to the police, he replies that "police are p***". He claims that Piotr molested a child who lived down the street from his parents and that he knew because she told him.

¶ 35    Defendant eventually tells the detectives, "I guess I lost it". When asked what happened when he lost it, defendant says, "you see what happened." When pressed for details about the crimes, he repeatedly states that it does not matter and gives no substantive answers. He repeats his claim that his mother was a whore, and that she was cheating on his father with "big Mexicans." The detectives ask if defendant has anything else to tell them and he repeats his statement that they are "f*** sick." The detectives then leave once again.

¶ 36    When the detectives return, they are accompanied by a forensic investigator who photographs defendant and collects his shoes, shirts, and shorts. They give defendant a pair of pants, but when he learns that they were taken from his parents' house he tells the detectives that they are sick. After the detectives leave the room, defendant loudly says "mother f***" three times. In the final portion of the ERI, the detectives show defendant photographs of a hammer and a knife. Defendant claims not to recognize either.

¶ 37    After the State rested in rebuttal, the court found defendant guilty but mentally ill of the murder of Maria and the attempt murder of Piotr. The court relied heavily on Piotr's testimony, which the court found very persuasive. The court found that Piotr's testimony showed a serious and longstanding enmity between the brothers. Moreover, the court made the following findings:

> "[E]ven though I do not believe *** the defense has proven by clear and convincing evidence that he lacked the substantial capacity to appreciate the criminality

of his conduct, I do believe that the defendant has proven by a preponderance of the evidence that the defendant was mentally ill as defined under the statute *** .

It's also stated in [the statute] *** mental illness or mentally ill means a substantial disorder of thought, mood or behavior which afflicted a person at the time of the commission of the offense which impaired that person's judgment but not to the extent that he is unable to appreciate the wrongfulness of his behavior. I do believe, most likely because of his cannabis abuse, that he did have a disorder of mood, thought or behavior. He chose to be homeless. He apparently was paranoid with regard to his family and particularly his participation with Piotr. He believed that people were -- particularly family members were harassing him and hassling him. And, again, as I stated, peeing in his shoes and also peeing in his iced tea."

¶ 38 Defendant filed a motion for a new trial, arguing that the court erred in finding that he had failed to meet his burden to show that he was legally insane at the time of the crimes. The court denied the motion.

¶ 39 This appeal follows.

¶ 40                              ANALYSIS

¶ 41 On appeal, defendant raises a single issue, contending that the court's finding that he was guilty but mentally ill was against the manifest weight of the evidence. In particular, he argues that the evidence established that (1) he suffered from schizophrenia at the time of the offense, and (2) that he lacked the substantial capacity to appreciate the criminality of his conduct. He therefore asks us to overturn his convictions.

¶ 42    In Illinois, it is presumed that all defendants are sane. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 62. Under the insanity defense, a person is not criminally responsible for his conduct if, at the time, he lacked substantial capacity to appreciate the criminality of his conduct due to mental disease or defect. 720 ILCS 5/6-2(a) (West 2014). When a defendant raises the insanity defense, it is his burden to prove by clear and convincing evidence that he is not guilty by reason of insanity, while the State retains the burden of proving him guilty beyond a reasonable doubt of the charged offenses. 720 ILCS 5/6-2(e) (West 2014). Evidence is "clear and convincing" if it "leaves no reasonable doubt in the mind of the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). "Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense." *Id.*

¶ 43    A person who was not insane at the time he committed a criminal offense, but was suffering from a mental illness, is criminally responsible for his conduct and may be found "guilty but mentally ill." 720 ILCS 5/6-2(c) (West 2014). "Mental illness" is statutorily defined as "a substantial disorder of thought, mood, or behavior which afflicted a person at the time he committed an offense, and which impaired his judgment, but not to the extent that he was unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(d) (West 2014). "Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane." *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008).

¶ 44    The first half of defendant's argument relates to the specific nature of his mental condition. He argues that the manifest weight of the evidence showed that he suffered from

schizophrenia at the time of the offenses. Defendant makes much of the court's apparent preference for Dr. Cooper's diagnosis of drug use disorder over Dr. Echevarria's and Dr. Seltzberg's diagnoses of schizophrenia. He points to testimony by his own experts, as well as the testimony of Dr. Curran, who diagnosed him with "unspecified schizophrenia spectrum disorder."

¶ 45   The circuit court, however, did not—and was not asked to—make a specific finding on whether defendant was schizophrenic. Mirroring the language of the insanity statute, the court found, "most likely because of his cannabis abuse, that [defendant] did have a disorder of mood, thought, or behavior." See 720 ILCS 5/6-2(d) (West 2014). That finding was clearly consistent with the expert testimony. All four experts diagnosed defendant with cannabis use disorder, as well as at least one other condition, be it schizophrenia, unspecified schizophrenia spectrum disorder, or "unspecified personality disorder with antisocial and paranoid features."

¶ 46   The key question, therefore, is not the specific nature of defendant's mental condition, but whether "he lacked substantial capacity to appreciate the criminality of his conduct" because of that condition. This point was made abundantly clear in Dr. Seltzberg's testimony that one may "absolutely" suffer from schizophrenia and still be legally sane. So even if we were to accept, *arguendo*, that the court erred in not specifically finding that defendant suffered from schizophrenia, that would not be the end of our inquiry.

¶ 47   We turn then to the question of whether the court erred in finding that defendant, despite his mental condition, was still able to appreciate the criminality of his conduct. Whether a defendant was legally insane or mentally ill at the time he committed an offense is a factual question that is generally determined by the trier of fact. *Romero*, 2018 IL App (1st) 143132,

¶ 63. The fact finder's determination of these issues will not be disturbed on review unless it is against the manifest weight of the evidence. *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007). A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly evident, or where the finding is arbitrary, unreasonable, or not based on the evidence presented. *Romero*, 2018 IL App (1st) 143132, ¶ 64 (citing *People v. Deleon*, 227 Ill. 2d 322, 332 (2008)). When confronted with a battle of the experts, it is "for the trier of fact to evaluate the expert testimonies and weigh their relative worth in context." *People v. Sims*, 374 Ill. App. 3d 231, 251 (2007). That is, the circuit court was not required to accept the testimony of defendant's experts over the State's experts.

¶ 48    The heart of defendant's argument on this point is that the defense experts were more credible than the State's experts, particularly Dr. Cooper. Defendant attacks Dr. Cooper's credibility on several grounds. First, he argues that Dr. Cooper's diagnosis was not credible because he was the only expert who did not opine that defendant suffered from schizophrenia. Additionally, defendant questions the validity of Dr. Cooper's methods, including his reliance on the MMPI despite defendant's apparent language difficulties.

¶ 49    It is the responsibility of the trier of fact to determine the credibility of the witnesses, the weight given to their testimony, and the inferences to be drawn from the evidence. *Sims*, 374 Ill. App. 3d at 251. The trier of fact is in the best position to observe a witness as he testifies, and may accept as much or as little of his testimony as it sees fit. *Id.* "This rule also applies to expert opinions on sanity, and the weight of such an opinion is to be determined by the reasons given and the facts supporting the opinion." *Id.* The trier of fact may entirely reject an expert's testimony if it concludes that the defendant was sane based on factors including lay testimony

from witnesses who observed the defendant around the time of the offense, whether the defendant planned the crime, and any attempt by the defendant to conceal the crime. *Romero*, 2018 IL App (1st) 143132, ¶ 63.

¶ 50 Defendant argues that Dr. Cooper was the only expert who did not diagnose defendant with schizophrenia, and that, given the other doctor's competent explanation for their diagnoses, Dr. Cooper must therefore be unreliable. However, the mere fact that Dr. Cooper's diagnosis differs from those of defendant's witnesses is neither dispositive nor surprising. As the State points out Dr. Curran did not actually diagnose defendant with schizophrenia; he diagnosed defendant with "[u]nspecified schizophrenia spectrum and other psychotic disorder." The distinction is not explored in the record, but it is important to note that, in crafting his diagnosis, Dr. Curran observed that defendant did not appear to suffer from "true auditory hallucinations." Both Dr. Curran and Dr. Cooper expressed doubt on this issue primarily because defendant's self-reporting of auditory hallucinations was not inherently reliable.

¶ 51 As to the reliability of Dr. Cooper's methods, defendant puts a great deal of emphasis on the fact that Dr. Cooper relied on the MMRI, despite defendant's apparent language difficulties. He points out that Dr. Curran testified that the MMRI results had to be interpreted with caution for that very reason. This ignores, however, that Dr. Cooper himself testified that the results of the test must be considered with caution and that he *did* exercise caution by interpreting the results of the exam "very conservatively so as to not misconstrue the information." Moreover, Dr. Cooper explained that the diagnosis was not simply taken from the computer readout from the exam, but was also the result of his own examination of defendant, defendant's previous medical records, and the ERI—in short, the same materials relied upon by the other experts. To

the extent that Dr. Cooper's reliance on the MMRI undercut his credibility as a witness, it remained the purview of the circuit court to weigh that credibility. See *People v. Johnson*, 318 Ill. App. 3d 281, 287 (2000) ("Issues concerning the quality of the testing process itself" go to the weight of an expert's testimony). We cannot say that Dr. Cooper's testimony was so unreliable that the circuit court should have disregarded it entirely.

¶ 52    *People v. Wilhoite*, 228 Ill. App. 3d 12, (1991), is instructive on this issue. In that case, this court overturned the defendant's conviction because the State's lone expert on the issue of sanity lacked proper foundation for his opinion. *Id.* at 21. The State's expert opined that defendant was not insane, but merely intoxicated on cannabis. *Id.* However, the expert admitted that he had not made any inquiry into how much cannabis defendant had consumed. *Id.* With no information on that essential question, the witness lacked any foundation for his opinion that defendant was intoxicated rather than insane. *Id.* In this case, defendant can point to no such foundational flaw in Dr. Cooper's expert opinion. As discussed above, Dr. Cooper offered a detailed explanation of his methods and reasoning. Whatever credibility questions defendant can raise as to Dr. Cooper's testimony, they do not rise to the level of those in *Wilhoite*, where the trial court improperly considered the expert's testimony *at all*.

¶ 53    Moreover, Dr. Cooper's opinion was far from the only opinion evidence that the court had to consider. In this case, there were a total of four expert witnesses: two who opined that defendant was insane and two who opined that he was not insane. In making its determination on this issue, the court was free to accept the opinion of one expert witness over another, or accept part and reject part of each expert's testimony. See *People v. Baker*, 253 Ill. App.3d 15, 27-28

(1993). However, a fact finder may only disregard expert testimony if there is sufficient contrary evidence. *People v. Kando*, 397 Ill. App. 3d 165, 197 (2009).

¶ 54    Defendant relies on *Baker*, *Kando*, and *People v. Arndt*, 86 Ill. App. 3d 744 (1980) in support of his argument that the court inappropriately disregarded his experts' testimony. These cases, however, are easily distinguished from the present case. In *Baker*, "four expert witnesses testified that defendant was insane at the time of the crime and *** no expert witnesses testified on behalf of the State." *Baker,* 253 Ill. App.3d at 27. In *Arndt*, two doctors testified for the defense; none testified for the State. *Arndt*, 86 Ill. App. 3d at 750. Similarly, in *Kando*, the defense introduced two experts and the State introduced none. *Kando*, 397 Ill. App. 3d at 197.

¶ 55    The State is not required to present *any* expert testimony to defeat an insanity defense and may reject a defense expert's opinion on the issue if the other evidence in the case tends to show that defendant was sane. *Romero*, 2018 IL App (1st) 143132, ¶ 63. In this case, the State presented two expert witnesses who both opined that defendant was not legally insane at the time of the crimes. Even if Dr. Cooper's testimony was entirely incredible—an argument that we have already rejected—Dr. Curran testified credibly for the State. He opined, based on interviews with defendant, review of medical records, and review of the other experts' reports, that defendant was legally sane at the time of the crimes. Among other things, Dr. Curran questioned whether the voices that defendant reported hearing were "true auditory hallucinations."

¶ 56    Defendant also argues that, even independent of the expert testimony, none of the other evidence in the case could support a finding that he was legally sane at the time of the crimes. He contends that the State presented no evidence of a motive other than his own paranoid delusions. He also argues that State offered no evidence that he appreciated the criminality of his acts.

¶ 57    Regarding the presentation of a rational motive, the State rightly points out that motive is not an element of either crime with which defendant was charged and that it was defendant's burden to overcome the presumption of his sanity. *Romero*, 2018 IL App (1st) 143132, ¶ 62. Even so, the circuit court heard plenty of evidence to conclude that defendant's motive stemmed from long-standing enmity towards Piotr and the fact that defendant had been threatening to kill Piotr for years. See *People v. Taylor*, 110 Ill. App. 3d 112, 118 (1982) (prior threats to kill victim are evidence of planning, which supports a finding of sanity). The court also heard evidence that defendant's relationship with his mother was strained and that she encountered defendant while he was lying in wait to attack Piotr. It may be tempting to say that no sane person *could* bludgeon his own mother to death with a hammer and then attempt to do the same to his brother. This is not, however, the state of the law. See *People v. Skorka*, 147 Ill. App. 3d 976, 982 (1986) ("defendant's murdering two neighbors is bizarre and unusual behavior, [but] does not constitute proof of legal insanity.").

¶ 58    Despite defendant's argument to the contrary, the record provides ample non-opinion evidence that shows that defendant appreciated the criminality of his actions. Defendant reported that he went to the house specifically to kill Piotr and that he hid in the basement with his hammer for over an hour before Maria found him. He also told at least one of the experts that he had intended to kill Piotr and then drive his mother's car to Canada. Such planning could be interpreted by a finder of fact as indicative of sanity. See *Skorka*, 147 Ill. App. 3d at 982 ("the existence of a plan or design for a crime *** are factors relevant to a determination of defendant's sanity."). Moreover, upon his arrest, defendant made a false exculpatory statement to the police, telling them that "he [Piotr] did it." See *People v. Ford*, 118 Ill. App. 3d 59, 63-64

(1st Dist. 1983) (citing false exculpatory statements as evidence of sanity). Defendant attempts to recast this statement as possibly referring to his alleged delusions about Piotr molesting children, but this is undercut by his own statement to Dr. Cooper that he had lied to the police that Piotr had killed Maria. Moreover, the court was able to observe defendant's ERI, which as several of the experts explained, was particularly probative of defendant's mental state because of how close it was in time to the crimes. Although defendant argues that his behavior during the ERI clearly shows that he was insane, the court observed, as did Drs. Echevarria, Curran and Cooper, that defendant does not appear to be responding to any hallucinations during the ERI. And, as noted above, Dr. Cooper characterized the defendant's behavior during the ERI "as facetious, oppositional, inconsistent, [and] sarcastic" rather than insane, and the circuit court could have come to that conclusion as well.

¶ 59 Considering all the State's rebuttal evidence, a reasonable fact finder certainly could have concluded that defendant's expert witnesses were sufficiently rebutted. There was ample evidence in the record to support the circuit court's decision to reject, in whole or in part, the defendant's experts. See *Kando*, 397 Ill. App. 3d at 200 (rejection of defendant's experts' opinions is error if the rejection is "unsubstantiated by the record"). The question of defendant's sanity was a very close one, as is evidenced by the fact that the four expert witnesses who examined him were evenly split on this ultimate issue. However, this is precisely why this court cannot and will not substitute its own judgment for that of the circuit court. See *People v. Manion*, 67 Ill. 2d 564, 578 (1977) ("A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses" (internal quotation marks omitted)). It was the circuit court's responsibility to

consider all of the evidence presented and determine whether defendant was legally insane at the time he committed the offenses. Having carefully reviewed the evidence, the circuit court found that defendant was guilty but mentally ill.

¶ 60                                 CONCLUSION

¶ 61    Defendant argues forcefully that his experts were more credible than the State's experts and that the evidence supported his claim of insanity. We cannot say, however, that the conclusion that he was legally insane was clearly evident, or that the circuit court's finding was arbitrary, unreasonable, or not based on the evidence presented. See *Romero*, 2018 IL App (1st) 143132, ¶ 64. Accordingly, the court's finding the defendant was guilty but mentally ill was not against the manifest weight of the evidence. Consequently, we affirm the judgment of the Circuit Court of Cook County.

¶ 62    Affirmed.